Johanne Metz, Appellee, v. Yellow Cab Company, Appellant.

Gen. No. 32,242.

610

Opinion filed May 8, 1928,

SAMUELS, COSTELLO & GREENBERG and C. C. CUNNING-HAM, for appellant.

HETH, LISTER & COLLINS, for appellee.

MR. JUSTICE SCANLAN delivered the opinion of the court.

The plaintiff, Johanne Metz, sued the defendant, the Yellow Cab Company, a corporation, for personal injuries alleged to have been sustained while she was riding as a passenger in one of the taxicabs of the defendant. There was a trial before the court with a jury and a verdict returned finding the defendant guilty and fixing the plaintiff's damages at the sum of $7,500. Judgment was entered on the verdict and this appeal followed.

The defendant is a common carrier, and about 5 o'clock p. m., May 21, 1925, the plaintiff and Mrs. Fisher, a friend, became passengers in one of the defendant's cabs at State and Madison streets, Chicago. The plaintiff told the driver to take her to her home in Evanston. The driver sat in the front seat, the two passengers in the rear seat, and there was a glass window between the driver and the part of the car where the women sat. The accident occurred about 5:30 or 6 o'clock p. m., daylight saving time. It was a bright, sunny day. Just prior to the accident the cab was proceeding northward, on the right-hand side of the road, on West Railroad avenue, in Evanston. The width of the avenue from curb to curb is 30 or 35 feet. There was a Ford chassis proceeding in a southward direction on the west side of the same avenue and close to the west curb. The cab of the defendant suddenly swerved to the left, "went directly across the road," hit the front of the rear wheel of the Ford and "took the rear end right off that car," then hit the curb on the west side of the street, went over it and into a big tree that "would measure about five feet right straight

through." The accident, as one witness testified, happened "absolutely all in a flash," or, as other witnesses said, "it all happened very suddenly." The driver of the Ford testified that as the cab swerved to the west he blew his horn, and that the driver of the cab was looking backwards at the time. The defendant offered no evidence as to the manner of the accident. The plaintiff sues to recover damages for injuries alleged to have been sustained in the accident.

The negligence of the driver of the cab is undisputed but the defendant, a common carrier, contends that "the record does not show ordinary care on the part of the plaintiff." This contention is based upon certain questions and answers in the cross-examination of the plaintiff. We will quote them in full: "Q. And your eyesight was good that day, wasn't it? A. Yes. Q. And your hearing good? A. Yes. Q. And coming along on Railroad Avenue, were you paying any attention as to the movements of the cab at all? A. No, I did not. Q. Were you talking with Mrs. Fisher? A. Yes. Q. So that there wasn't anything unusual or out of the way about the movements of the cab? A. No, I don't remember anything until the car turned. Q. Up to the time that you felt a bump, up to the time—up to that time nothing occurred that would alarm you in any way, or cause you any concern of any character, is that right? A. Yes." The defendant asserts "that although the plaintiff had her faculties of hearing and sight, she did nothing for her own safety. Having made no effort to avoid danger, she was guilty of negligence which will prevent a recovery." Nowhere in its briefs, however, has the defendant stated, or even suggested, what it thinks the plaintiff, in the exercise of ordinary care, might have done to avoid the accident. There was a glass partition between the driver and the passengers. The trip to the place of the accident was uneventful, and the accident happened "absolutely all in a flash," and it was

brought about solely by the highly negligent and un-expected conduct of the driver of the cab. The theory of fact of the defendant, as disclosed in the cross-examination of the plaintiff and Mrs. Fisher, was, that the trip, until the time of the accident, had been un-eventful and that there was nothing about the situation to alarm the passengers until just about the time of the collision.

The defendant cites in support of its contention the rule announced in *Pienta v. Chicago City R. Co.,* 284 Ill. 246, 259. Neither in that case nor in any of the others cited was the plaintiff a passenger of a common carrier. In the *Pienta* case the plaintiff was riding on a wagon, the driver of which turned the wagon into a street railroad track upon which a street car was ap-proaching, and the plaintiff was injured as the result of a collision between the car and the wagon and it was held that it was the duty of a passenger in a vehicle, *where he has an opportunity to learn of approaching danger and avoid it,* to warn the driver of the vehicle of such danger, as he has no right, because some one else is driving the vehicle, to omit reasonable and prudent efforts on his part to avoid the danger. Our Supreme Court has never applied this rule to a com-mon carrier and passenger case, but even if it could be fairly argued that the rule in the *Pienta* case con-trols such a case, nevertheless, under the uncon-troverted facts bearing upon the instant accident, there was no approaching danger for the plaintiff, in the exercise of ordinary care, to learn of, and no opportu-nity for the plaintiff, in the exercise of ordinary care, to do anything to prevent the driver of the cab from bringing about the collision. It is elementary law that the degree of care which a plaintiff in a given case is bound to exercise will be found to depend upon the rel-ative rights or position of the parties at the time the injury complained of happened, and that a passenger of a common carrier is not obliged, in the exercise of

ordinary care, to anticipate negligence on the part of the carrier; that if he assumes the carrier will not be negligent and acts accordingly, he will not, for that reason alone, be negligent. Certainly it is not the law that a passenger of a common carrier must be constantly on the *qui vive* to prevent a servant of the carrier from acting carelessly in the management of a train, street car or cab. The observance of such a rule of law would place upon a passenger an intolerable and highly unjust burden and would only tend to hinder and annoy the servant of the carrier in his control of the train, street car or taxicab, and tend rather to cause, than to prevent, an accident. Under the uncontroverted facts of the instant case, we are of the opinion that the plaintiff at the time of the accident and just prior thereto was, as a matter of law and as a matter of fact, in the exercise of ordinary care for her own safety.

The defendant next contends that the court erred in the admission of certain testimony of Dr. Balderston. The doctor had been the regular physician in the family of the plaintiff for 10 or 15 years. He saw her at the hospital shortly after the accident and treated her for her injuries—in conjunction with Dr. Ford—during the period that she remained at the hospital, and also attended her after she went to her home. She called on him in December, 1926, and January, 1927, and notified him that her case was coming up and that she would like him to testify as to her condition, and on the last visit he made a physical examination of her and found a deformity in the malar bone; a swelling of the tissues in the left leg; that there was an inch and one-half difference in circumference between the injured knee and the right knee, when measured immediately above the kneecap; that there was a condition of chronic arthritis, or chronic rheumatism in the joint and around the joint, "arthritis and periarthritis"; that there were two scars around the knee.

He tried to flex the knee and found a limitation of motion of perhaps one-quarter of the normal range of the joint. It could not be bent as far as the other. The doctor stated that he believed the condition he found in the leg to be permanent. During the examination the following occurred: "Q. What did you find? Mr. Cunningham: Objected to unless the Doctor is confined to objective symptoms alone. The Court: He is asked what he found, found is objective. * * * Objection is overruled. * * * Mr. Heth: Doctor, you understand in answering this question you can't tell what Mrs. Metz told you in this examination. My question is what did you find out from the examination." The doctor then proceeded to testify as to various conditions that he found at the time of the examination. The defendant contends that the court erred in allowing the witness to answer the last question. We find no merit in this contention. Further on the doctor testified that he had tried to flex the knee of the plaintiff. He was then asked the following question: "Q. What did you find? Mr. Cunningham: I object to that * * * on the ground that it is not purely an objective symptom. The Court: Let him answer. The Witness: There was limitation of motion. Mr. Cunningham: I move that be stricken out; that is his opinion. The Court: Objection overruled. Mr. Heth: Now, explain. Mr. Cunningham: I object. The Witness: The left knee joint could not be bent as far as the other one. Mr. Cunningham: I move that be stricken. The Court: No, I will let it stand * * * it might have improved it by saying that he found he could not, somebody else might; that is a question to what I have confined the Doctor, to what he found. Mr. Cunningham: That has all been qualified by objectively, if the court please." The defendant contends that the court erred in allowing the last answer to stand. The defendant's counsel made no request to be allowed to interrogate the wit-

ness to determine whether the answer of the doctor would be based entirely upon objective symptoms, and there is nothing in the foregoing examination that would indicate to the court that the answer complained of was based partly upon subjective symptoms. On the cross-examination the doctor testified that the knee is a joint controlled by voluntary muscles; that any such joint controlled by voluntary muscles is under the control, more or less, of the patient, and that the only absolute, certain way of making an examination of such a joint is to place the patient under an anaesthetic. At no time after these answers were made did the defendant make any motion to strike the answer in question that had been made on the direct examination, nor did it in any way call the attention of the court to the effect that the answers given on cross-examination had on the answer that it now contends should have been stricken. Doubtless the court, after the cross-examination, if the defendant had seen fit to call attention to the matter, would have stricken the answer in question. We see no reason, in view of defendant's attitude, why it should now complain. The doctor was asked on direct if he had an opinion as to whether or not the condition which he found in the plaintiff's leg was permanent, and after he answered in the affirmative the following occurred: "What is your opinion? Mr. Cunningham: I object  *  *  * first on the ground that it is incompetent and irrelevant; secondly that it is improper; thirdly calls for improper evidence; fourthly that it evades the province of the jury. The Court: Let him answer. A. I believe it is permanent." The defendant complains of this answer because the doctor "did not testify that it was 'reasonably certain' to be permanent or anything of that import" and cites in support of its contention *Lauth v. Chicago Union Traction Co.*, 244 Ill. 244; *Kimbrough v. Chicago City R. Co.*, 272 Ill. 71; *Lyons v. Chicago City R. Co.*, 258 Ill. 75. The defend-

ant made no motion to strike out the answer, nor did it, in the objections that it made to the question, raise the point that it now urges. It is, of course, the law that an opinion of a physician must be based upon reasonable certainty, but it was the duty of the defendant, when the question was put, to insist that the question should be so framed as to call for an opinion based upon reasonable certainty. The plaintiff would then have had an opportunity to reframe the question. In each of the three cases cited the defendant appraised the trial court of the defect in the question or the answer complained of. It is clear from the record that the present contention is an afterthought.

The defendant next contends that it was error to allow the doctor to testify that the condition of the knee, as he found it, was permanent, for the reason that the opinion was not based on a hypothetical case and therefore it was an invasion of the province of the jury. It is a sufficient answer to this contention to say that it was perfectly proper for the doctor, having testified as to the conditions that he found, to give his opinion as to their permanency. (See *Owens v. Guerney*, 241 Ill. App. 477, 483, and cases cited.)

The defendant next contends that ''the attorney for the plaintiff was guilty of improper conduct in addressing the jury.'' During the argument of plaintiff's counsel the following occurred: ''Mr. Heth: It is only by a stroke of Providence, anyway, that that man, that criminally negligent driver, is not under indictment for manslaughter. Mr. Cunningham: I object to that statement. The Court: Yes, because he couldn't be guilty of manslaughter when he only hurt somebody. * * * Mr. Cunningham: I desire to save an exception to that remark of counsel. The Court: Confine yourself to the facts, Mr. Heth. Mr. Heth: Well, it is so in this case that this driver was so criminally negligent that I say it is only by a stroke

of Providence that these people were not killed. Mr. Cunningham: I object to that statement. Mr. Heth: I have a right to draw these inferences from the evidence. * * * The Court: Yes, I believe you are right. Mr. Cunningham: And I save an exception to the remarks of counsel.'' Under the facts of this case we think the question of the conduct of the taxi driver at the time of the accident was a fair subject for argument and we do not think it was improper for the attorney for the plaintiff to urge that it amounted to criminality. Where the facts warrant it such an argument is not improper. (See *Casey v. Kelly-Atkinson Const. Co.,* 240 Ill. 416, 425.) Later in his argument, in referring to Dr. Baylor, who testified for the defendant, counsel said: "The doctor who took the stand, this professional witness for the Yellow Cab Company.'' The defendant objected to this statement and the objection was overruled. The evidence shows that Dr. Baylor had served as a physician for the defendant in accident cases for seven or eight years and that in the last year preceding his testimony he had seen at the request of the defendant "probably fifty or a hundred, maybe more,'' persons who were injured in accidents in which the defendant was concerned, but the evidence does not reasonably warrant the argument that he was a professional witness for the Cab Company. But we do not believe, in view of the facts of this case, the statement complained of constitutes reversible error, nor do we think that the further statement of the counsel that Dr. Baylor was very careless with the truth can be seriously complained of, as the only time that the doctor saw the plaintiff was at the hospital the day after the accident, when he called to see her at the request of the defendant, and, as he testified that between that time and the trial he had examined between 15 and 16,000 people, his statement that he had an independent recollection of the plaintiff's condition at the time in question cer-

tainly gave the counsel the right to comment on the credibility of the witness.

The defendant next contends that it was error for the counsel for the plaintiff to state to the jury that "$25,000 and all the money that the Yellow Cab Company has, wouldn't take the use of my left leg away from me." When an objection was made to this statement, the court said: "Strike it out, because we are not valuing his leg." While the statement was an improper one, we fail to see how it was harmful, especially in view of the ruling of the court.

The defendant next contends that the court erred in giving to the jury, at the request of the plaintiff, instruction number two, and in refusing to give instructions numbers five and seven tendered by the defendant. None of these instructions relates to the question of damages, and as the plaintiff's proof sustains the material allegations of the declaration, which consisted of one count, and as the negligence of the defendant is not disputed, and we have held that the plaintiff at the time of the accident and just prior thereto was, as a matter of law and as a matter of fact, in the exercise of ordinary care for her own safety, we do not deem it necessary to answer the contentions of the defendant in reference to the instructions in question.

The defendant next contends that "the verdict on which the judgment is based is so large as to indicate that it was arrived at by passion or prejudice." The evidence clearly shows that the plaintiff was very badly bruised and battered by the accident; that "there were some wounds on various parts of the body"; that she was in the hospital for some weeks, and during part of that time suffered so much from pain, nervousness and shock that she was given hypodermic injections. The swelling around her left eye "grew to the size of a large hen egg" and it was necessary to draw blood to relieve the pressure. The left side of her face, because of the swelling, was twice the

normal size. The swelling around the knee joint of the left leg grew so large that it was necessary to draw therefrom, at one time, a pint of blood. A cast was placed on her left leg. She has a marked deformity on the left side of her head, ''a fracture of the zygomatic arch of the malar bone.'' She has constant headaches, and one eye twitches. She cannot bend her leg back in a normal way. She has a chronic condition of arthritis, a limitation of motion in the knee and a swelling of the tissues of her leg, and Dr. Balderston testified that in his opinion the condition of the leg is permanent. The plaintiff left the hospital on crutches and with the cast on the left leg. She testified that she cannot walk or dance or swim without pain and that she constantly experiences the feeling of ''knuckles'' in her knee; that for a long period of time after the accident she suffered pain; that she was compelled to use two crutches until the September after the accident and one crutch until the following April. The amount of damages to be allowed is peculiarly a question for the jury and this court will not disturb a verdict unless it is clearly excessive or inadequate, indicating passion or prejudice on the part of the jury. We feel satisfied that we would not be justified in sustaining the present contention.

The defendant next contends that ''the trial court erred in not granting a new trial on the affidavits filed.'' The defendant in support of its motion for a new trial introduced certain affidavits tending to show that the plaintiff used a crutch for about one month after leaving the hospital; that in the last week of August, 1925, she was at a summer resort, where she used no crutch; that while there she drove an automobile, danced, took long walks, ran, went swimming, and dived from a boat; that at no time did she treat her knee, nor did she complain of injury to, or pain in, her knee, and that prior to the accident in question she suffered from a ''housemaid's knee.'' It has been

frequently held that applications for new trial on the ground of newly-discovered evidence are not looked upon with favor by the courts and that such application should always be subjected to the closest scrutiny. In *Graham v. Hagmann*, 270 Ill. 252, 262, the court quoted with approval the following from *Chicago & A. R. Co. v. Raidy*, 203 Ill. 310: "It cannot be the practice of courts to allow important matters to go to trial, and because one party is not satisfied with the results of it let him go out and try to get facts which will enable him to do better at another trial, and rely upon such after-ascertained matters as a basis for a new trial." In *People v. Dabney*, 315 Ill. 320, 327, the court said: "The burden is on the applicant to rebut the presumption that the verdict is correct and to show that there has been no lack of due diligence," and that "the evidence must fulfill the following requirements: First, it must appear to be of such conclusive character that it will probably change the result if a new trial is granted; second, it must have been discovered since the trial; third, it must be such as could not have been discovered before the trial by the exercise of due diligence; fourth, it must be material to the issue; and fifth, it must not be merely cumulative to the evidence offered on the trial." The defendant contends that it was surprised on the trial by the claim that the plaintiff suffered a fracture and had sustained a permanent injury, and that she had been compelled to use crutches until April, 1926, and also by the plaintiff's testimony that she did not have a "housemaid's knee" prior to the accident. At no time after the plaintiff's evidence did the defendant in any way indicate to the court that it was surprised by any of the evidence in reference to the plaintiff's injuries or condition. No application for time was made, nor did the defendant thereafter ask that a juror be withdrawn and the cause continued. The accident happened May 21, 1925. The trial of the case commenced Feb-

ruary 28, 1927. Plaintiff resided in Evanston and her address was known to defendant from the time of the accident. The affidavits in question were made by parties residing in Evanston. Dr. Baylor, acting for defendant, saw and examined the plaintiff in the hospital the day after the accident, and there is nothing in the record to indicate that he might not have seen her thereafter at any time he saw fit. The cross-examination of the plaintiff would indicate that the defendant had learned what the physical condition of the plaintiff had been for years and apparently it knew what doctors and dentists she had seen in that time, and she was questioned closely with reference to certain alleged ailments. She was interrogated in relation to her former husband and the fact that he had been cruel to her and that on one occasion he knocked two of her teeth out and that at another time he choked her and injured her face, and that she had obtained a divorce from him on the grounds of cruelty. In an affidavit of H. R. Hellwig, "in charge of claims and litigated cases made and brought against the defendant," the affiant states that he was in charge of the instant suit from the time of the accident and that he received from Dr. Ford a signed statement (not introduced on the motion) that there was no permanent injury to the plaintiff and that therefore he was surprised on the trial by the testimony offered by the plaintiff in regard to her injuries, but this affiant admits that he learned prior to the trial that Dr. Ford was dead, and therefore he had no right to rely upon the signed statement of the latter. Further, it appears that the defendant called Dr. Baylor and he testified to seeing the plaintiff the day after the accident and examining her and that her injuries were not serious and were not permanent, and that she told him at that time that she had a housemaid's knee in her left leg prior to the accident. Evidence merely cumulative to that offered on the trial will not warrant a new trial. The granting of a new

trial because of newly-discovered evidence is largely a matter of discretion with the trial court, and we feel that we would not be justified in holding that the trial court in the instant case abused its discretion.

We are satisfied that the judgment of the superior court of Cook county should be and it is affirmed.

*Affirmed.*

BARNES, P. J., and GRIDLEY, J., concur.