Celia Styburski and Dorothy Styburski, Minor, by Frank Styburski, Her Father and Next Friend, Appellees, v. Riverview Park Company, Appellant.

Gen. No. 40,080.

2

Opinion filed December 13, 1938.

RICHARD P. GARRETT, of Chicago, for appellant.

WRIGHT & KAMIN, of Chicago, for appellees; ALFRED KAMIN, of counsel.

MR. JUSTICE JOHN J. SULLIVAN delivered the opinion of the court.

This is an appeal from two judgments for $3,900 and $1,700 entered December 22, 1937, upon verdicts

of a jury for said amounts, in favor of plaintiffs, Celia Styburski and Dorothy Styburski, respectively, against defendant, Riverview Park Company, as damages for personal injuries sustained by plaintiffs on July 1, 1936, while riding as passengers upon an amusement device known as the "Aerostat." The claims of the two plaintiffs were asserted in one complaint and tried together before the same judge and jury.

For a clearer understanding of the issues it is necessary to set forth the facts somewhat fully. On July 1, 1936, defendant, Riverview Park Company, owned an amusement park in Chicago wherein it operated various riding devices, one of which was called the "Aerostat." This consisted of a pyramidal steel lattice work tower from 50 to 60 feet high, about 18 feet square at its base and tapering to almost a point at the top. On top of this structure was a revolving member placed horizontally and consisting of 6 sweeps or arms about 15 feet long from the center of the top to their outer edges. About half way up the structure there was an electric motor connected to this top revolving member by a belt running to pulleys, shafts and gears above, so that the power imparted by the operation of the motor caused said top member to rotate in a horizontal plane. The motor was controlled by a switch near the ground level, where the operator of the device was stationed. Sustained from the sweeps, so that when at rest they hung clear of the structure about 5 or 6 feet at their lowest point, were 3 cars or gondolas to carry patrons. Each car was connected to 2 of the overhead sweeps by 8 lines of cables, 4 cables to each side of a car, spaced at intervals from front to rear of same. These cables were made of galvanized steel wire rope ⅝ths of an inch thick and were about 100 feet long. A cable was looped through an eyelet or "swivel-yoke" in 1 of the 2 arms or sweeps from which each car was to be suspended, both lines of said cable

descending to be fastened opposite to each other on said car. A short distance below the aforementioned eyelet the 2 hanging portions of the looped cable were fastened together by a clamp called a Crosby clip, sort of a U bolt. The free ends of the cable were then passed through attachments on the car, said ends doubled back upon the respective lines of cable and secured to them by cable clamps. The cables were flexible in themselves, but there was no bending or kinking in them in the operation of the device. The method of attachment at the sweep and the weight of the cars caused the cables to be stretched straight from the yokes to the cars, whether the cars were in motion or at rest. Each car carried 12 people, 2 to a seat. The cars were about 10 feet long with upholstered seats and backs. With a load of 12 persons the gross weight of each car was about 2,800 pounds. Each line of cable was capable of carrying a load of 11,000 pounds. With a set of 8 lines of cables to each car, this would provide cable equipment capable of carrying a load of 88,000 pounds to each set. The cars at rest hung near enough to the ground so that patrons could step directly into them. When the cars were loaded and ready to start the operator moved the switch which controlled the electric motor and the cars started slowly to revolve around the central structure. As their speed was increased, they gradually moved away from the central structure and up in the air. Their top speed and elevation were reached in about 15 to 17 revolutions around the tower and then as the power was cut off and their speed diminished they gradually returned to the starting point through force of gravity, there being no mechanical brakes on the device. The entire operation of one ride took about 3 minutes. The device operated each afternoon from 1 to 5 p. m. and from 7 to 11:30 p. m. The whole operating season was 16 weeks, beginning at the middle

of May and ending about the middle of September. The device was exposed to the weather during this period. At other times the cables were put under shelter, given a coating of oil and grease and laid full length on a concrete floor inside a structure that protected them from the weather. An inspection of the cables, cars and other equipment was made by city of Chicago elevator inspectors each year prior to placing the device in operation. This inspection was made both before the cables and cars were taken from their place of storage and after the device was erected and ready for service. In addition to this, defendant had daily inspections made in the morning when a carpenter, one of its regular employees, climbed the tower and inspected the pulleys, gears, shafts, sweeps, cables and attachments at the top and also the cars at the ground level. The inspection of the top parts was done visually and by tapping the gears with a hammer. Inspection of the cables was made by this employee going out on the arms or sweeps and looking at the cables and their connections and by looking at them and their connections at the cars. The device was operated with the cars empty before being put into service each afternoon and evening. The cables were used 16 weeks in 1935 and about 6 weeks in 1936 before the accident in question occurred on July 1, 1936.

On that date plaintiffs, Celia Styburski and her cousin Dorothy Styburski, with their families were at Riverview Park for an outing. In the evening these girls, aged 17 and 15, bought tickets for the "Aerostat" and sat together on a seat toward the center of one of the cars. They had to wait a little while before they could get on because the ride was in operation and others were waiting ahead of them. The device and that portion of the park in its immediate vicinity were well lighted with electric lamps and, as plaintiffs saw said device, it seemed to be in good running order,

When their ride started the cars moved off slowly and smoothly and nothing happened until the car in which plaintiffs were riding had made several revolutions around the tower and was about a story and a half off the ground. Suddenly the inside front cable on said car snapped and fell and the car tipped somewhat toward the inside and was pulled in toward the tower. It struck the tower, was wedged there and either struck or was struck by the other two cars on the device. Plaintiffs were injured and both of them claimed to have little or no recollection of anything that happened at the scene of the accident after the cable snapped and something fell across their car. Before the accident the device was operating "O. K." and there was no evidence offered by any witness of anything of an unusual nature until the cable snapped. In addition to plaintiffs, Frank Styburski, the father of Dorothy Styburski, and his son George, testified as to the occurrence of the accident and the events just before and afterward. Their testimony varied somewhat from that of witnesses produced by the defendant as to the details of what occurred after the cable snapped, but there is no practical variance as to what occurred prior to the breaking of the cable.

Plaintiffs' witnesses testified that the broken cable swished around in the air through trees and bushes, while defendant's testimony had the loose end of the cable wedged into an angle in the lattice work of the structure and the other end attached to the car. All of the witnesses agreed that the car was pulled into the central structure as it went around it, but plaintiffs' witnesses testified that when the car finally stopped it was a "story" high and defendant's witnesses stated that it was about 10 feet high when it stopped. Plaintiffs were helped out of the car by Frank Styburski, his son George and employees of Riverview Park. They were taken to the first aid

station in the park and from there to St. Elizabeth's Hospital.

Defendant contends that "any presumption of negligence raised by plaintiffs' evidence was rebutted by the defendant's evidence"; that "the plaintiffs failed to make a case for submission to a jury"; that "the defendant did all that could be done to make the ride safe"; that "the thing that happened could not have been foreseen and, therefore, prevented by any human intelligence and foresight consistent with the practical operation of the device"; and that "the court should have taken the case from the jury at the close of all the evidence."

Plaintiffs' theory as stated in their brief is that "the relationship of carrier and passengers existed between them and the defendant; that the facts of the case properly invoked the doctrine of *res ipsa loquitur;* that a prima facie case of negligence was made out from the facts and circumstances; that the question of the sufficiency of defendant's rebuttal was one for the jury; that defendant's evidence did not meet the charges of negligence, but confirmed such charges."

It is conceded that the relationship of plaintiffs to defendant was that of passenger and carrier and that the doctrine of *res ipsa loquitur* was properly invoked. But defendant claims that "the doctrine of *res ipsa loquitur* is only a rule of evidence and, where properly applied, merely raises a presumption of negligence, which temporarily interrupts the flow of plaintiffs' evidence, and holds the proof in *statu quo,* until the defendant has offered some evidence of the exercise of that care imposed upon it by law, whereupon the doctrine of *res ipsa loquitur* vanishes and the interrupted flow of plaintiffs' evidence must be resumed." In our opinion this quoted assertion by defendant is not a correct statement of the law. The plaintiff in *Feldman v. Chicago Rys. Co.,* 289 Ill. 25, after stepping

down onto the pavement from the back step of a street car to transfer to another street car, was struck by the rear end of the street car from which he had alighted by reason of the rear trucks of said street car leaving the car tracks. In that case, after concluding that the plaintiff at the time of his injury was a passenger, the court said at pp. 34, 35 and 36: "The doctrine of *res ipsa loquitur* may be stated thus: When a thing which has caused an injury is shown to be under the management of the party charged with negligence and the accident is such as in the ordinary course of things will not happen if those who have such management use proper care, the accident itself affords reasonable evidence, in the absence of an explanation by the parties charged, that it arose from the want of proper care. (*Chicago Union Traction Co. v. Giese,* 229 Ill. 260.) . . . The charges of negligence in these counts were general and the doctrine of *res ipsa loquitur* applies. The rule is that negligence is never presumed, but that the circumstances surrounding the case where the maxim of *res ipsa loquitur* applies, amount to evidence from which the facts of negligence may be found; that is, in a case within the maxim of *res ipsa loquitur,* proof of the circumstances of such case and of the injury constitutes a *prima facie* case of negligence, and will justify a verdict unless such *prima facie* case is overcome by proof showing that the party charged is not at fault. (*Chicago Union Traction Co. v. Giese, supra; Chicago Union Traction Co. v. Newmiller,* 215 Ill. 383; *Chicago City Railway Co. v. Rood,* 163 id. 477; *New York, Chicago & St. Louis Railroad Co. v. Blumenthal,* 160 id. 40; *Hart v. Washington Park Club,* 157 id. 9.) The burden rested upon defendants in error to overcome the presumption of negligence arising from the circumstances in this case. The record contains no evidence explaining the cause of the accident or overcoming the presumption of negligence. We are of the opinion, therefore,

that the plaintiff in error was at the time of the injury a passenger, to whom defendants in error owed the highest degree of care, and that under the first and second counts of the declaration and the circumstances in this case a *prima facie* case of negligence was made out under the doctrine of *res ipsa loquitur*. There was no explanation of why the injury occurred. It follows that there was no evidence on the part of the defendants in error to overcome this presumption, and the jury were therefore justified in returning a verdict finding defendants in error guilty of negligence."

Defendant does not cite a single authority, where all of the essential elements are present for the application of the *res ipsa loquitur* maxim, to support its position that such maxim vanishes when some evidence is introduced by it of the exercise of that care imposed upon it by law, but relies upon *Bollenbach v. Bloomenthal*, 341 Ill. 539 and *Coal Creek Drainage District v. Sanitary District*, 336 Ill. 11. In the *Bollenbach* case plaintiff sought unsuccessfully to invoke the doctrine of *res ipsa loquitur* and in the *Sanitary District* case said doctrine was not even involved. Naturally neither of these cases limited the effect of the doctrine of *res ipsa loquitur* in properly applicable cases. It is true that a mere presumption is not evidence and that it vanishes in the face of evidence contrary to such presumption, but, as has been repeatedly held, negligence is never presumed, even where the doctrine of *res ipsa loquitur* is properly invoked. Under the doctrine circumstances surrounding the case amount to evidence from which the fact of negligence may be found and which may make out a prima facie case.

In discussing the maxim of *res ipsa loquitur* in *Chicago Union Traction Co. v. Giese,* 229 Ill. 260, the court said at pp. 263 and 264:

"That the burden of proving the existence of the duty, its breach and the resulting injury is on the com-

plaining party, is so well settled in the law of negligence that it requires no elaboration or citation of authority to sustain it. While this is true, there is a class of cases which are made out by showing the injury and connecting the defendant with it. When a thing which has caused an injury is shown to be under the management of the party charged with negligence, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, the accident itself affords reasonable evidence, in the absence of an explanation by the party charged, that it arose from the want of proper care. This rule of law results from the maxim *res ipsa loquitur*. Many cases are to be found illustrating the application of this rule. In some of them it is said that the rule is an exception to the general rule that negligence will never be inferred, while in others it is not treated as an exception but is treated as an evidentiary rule, under which the charge of negligence is regarded as proven, *prima facie,* by proof of facts showing that the thing which caused the injury was under the management and control of the defendant or his servants, and that the accident is such as in the ordinary course of things does not happen if those who have the management use proper care. . . . The more accurate statement of the law is that negligence is never presumed, but that the circumstances surrounding a case where the maxim of *res ipsa loquitur* applies amount to evidence from which the fact of negligence may be found. . . . It is a matter of common knowledge, however, that it is possible, by the exercise of ordinary care, to so construct and operate these conveyances that they will not leave the tracks, and when they do so and inflict an injury upon another who is lawfully in the street and free from contributory negligence, we think that no hardship is imposed upon these corporations to hold that such an injury is within the maxim *res ipsa loquitur,* and that

proof of the injury, under the circumstances stated, will justify a verdict unless such *prima facie* case is met by proof showing that the company is not at fault."

In outlining the considerations which ought to limit the application of the *res ipsa loquitur* doctrine and the reasons underlying same in 5 Wigmore on Evidence, sec. 2509 (2d edition, 1923) the author states:

"(1) The apparatus must be such that in the ordinary instance no injurious operation is to be expected unless from a careless construction, inspection, or user; (2) Both inspection and user must have been at the time of the injury in the control of the party charged; (3) The injurious occurrence or condition must have happened irrespective of any voluntary action at the time by the party injured. It may be added that the particular force and justice of the presumption, regarded as a rule throwing upon the party charged the duty of producing evidence, consists in the circumstance that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to him but inaccessible to the injured person."

In *Chicago Union Traction Co. v. Newmiller,* 215 Ill. 383, the court said at p. 386: "Where an injury occurs to a person who is a passenger, in the exercise of ordinary care, upon the car of a common carrier, by some defect in the machinery wholly under the control of the carrier, a *prima facie* case of negligence on the part of the carrier is established, and the burden of proof is upon it to show that the accident was without its fault. . . . The facts proved made a *prima facie* case of negligence against the appellant and were clearly sufficient to support the verdict, and therefore justified the court in overruling the motion to take the case from the jury. The question as to whether this *prima facie* case was rebutted by the appellant's evidence was one for the jury."

So in the present case it is not even intimated that plaintiffs were in any wise at fault and, a prima facie case of negligence having been established against defendant by the facts of the occurrence and the injury to plaintiffs, the burden of proof was upon defendant to show that the accident was without its fault. In answer to defendant's contentions that the trial court erred in refusing to instruct the jury to find it not guilty and that the verdicts are against the manifest weight of the evidence, it is sufficient to repeat that the facts of the occurrence proved a prima facie case of negligence against defendant, which was not overcome or rebutted by any evidence in the record and furthermore the question as to whether such prima facie case was overcome or rebutted by defendant's evidence was clearly one of fact for the jury.

Defendant's claim that the evidence produced by it showed that it complied with its duty to exercise the highest degree of care and caution consistent with the practical operation of device in question is refuted by the facts and circumstances in evidence, including its own testimony. Defendant was in exclusive control of the construction, maintenance, inspection and operation of the "Aerostat" and having such control it was its duty to present evidence of the true cause of the accident, under the established rule that such evidence is accessible to it but inaccessible to the injured person. Was any evidence produced as to the true or real cause of the occurrence? Of course the cable snapped, but there is no evidence in the record as to what actually caused it to break or snap. Defendant did introduce evidence as to the condition of the broken ends of the cable after the accident.

William Gierke, the operator of the device, testified that the broken ends of the cable "appeared to be torn"; that the ends were sort of frayed; and that "after these cables have been out in the elements, strands wear off."

John Sundberg, employed by defendant as a carpenter, testified "my duties was every day to inspect the cars, cables, connections, belt, gears and bails"; that his inspection of the cables consisted merely of looking at them and their connections; that to inspect the cables and their attachments at the upper portion of the device, he "climbed right on the arms where they were suspended from to give them a thorough examination"; that from that position he simply looked down at the cables to see if they were all right; that he had no experience in the construction of cables; that when he saw the broken ends of the cable in question after the accident "it seemed that it just snapped off . . . it just snapped"; that the broken ends did not appear frayed nor were the strands of the cable "separated or mushroomed out"; that the break in the cable was "almost square cut, almost like you would take a hack saw and cut them in two"; that "the break was what I determined to be right in the connection or below the cable clamp where the cables were clamped together . . . I should judge about fourteen inches" below the arm or sweep; that the cable snapped just below the Crosby clip or clamp; and that the break in the cable had the appearance of "a cut" as far as he was able to determine.

Frank Gaynor, chief elevator inspector for the city of Chicago, testified that upon inspecting the device the morning after the accident "we found that one cable had broken right up near the top where the ship would be suspended from the sweep, as we call it, overhead"; that the cable parted "right below where the Crosby clip was put on the cable to pinch the cable together . . . probably three inches below the Crosby clip . . . . It is a hard thing to determine, whether the tightening of the nuts on that Crosby clip may have pressed the cable together and broke some of the wires by pressing and tightening it or whether crystallization had set in on the cable . . . it is hard to deter-

mine''; that from his inspection he could not tell what caused the cable to break; that the cable consisted of 6 braided strands with 12 wires to a strand; that this type of cable cannot be cut very easily but that ''universally . . . a strand at a time breaks until the stress becomes too great for the remaining strands'' and then the entire rope breaks; that ''as long as one of the five or six strands would be there, the other five might be broken out a little, but they would not separate very much'' but this condition could be determined by looking at the cable; that the strands of the cable were broken; that ''they always part to a ragged edge like''; that the break was not clean cut; that it indicated ''not a wearing condition, a kind of tearing condition . . . it would stretch the wire a little and make the wire a little smaller and then finally separate''; and that if there was wear on the cable from friction or otherwise in swinging back and forth, it would occur ''not any more than a foot below'' the Crosby clip.

The evidence of defendant's witnesses just recited did not exculpate it from liability for plaintiffs' injuries but tended rather to show laxity in the inspection of the cable and that the defect in same might well have been discovered by the exercise of even ordinary care. While the device was constructed entirely of metal, a carpenter was assigned to inspect it. According to his evidence he climbed daily 50 or 60 feet to the top of the tower and then 15 feet out to the end of the sweep, from which point he made his inspection of the cable and its attachments. His inspection consisted of merely looking down at the cable. There is no evidence in the record that he could see the cable at the point where it broke approximately 3 inches below the Crosby clip. Above this clip was a thimble and above the thimble was the swivel yoke, through which the cable looped. It was not shown whether he looked downward at the cable through the eyelet in

the sweep or over the side or end of said sweep. At the most the inspection was perfunctory and not made by one qualified to inspect this all-metal device. This character of inspection alone clearly showed that defendant failed in its duty to exercise the degree of care required of it for the safety of passengers riding on its device.

Defendant claims that plaintiffs' counsel was guilty of prejudicial misconduct on the trial, which affected the verdicts, in that in his closing argument he made the following statement:

"He claims that that ride would have to swing or ride around a good many times before they would collect sufficient money to pay these girls what they are justly entitled to. He forgets at the same time it is not the only ride in the park, that it is only one of the attractions, and there are many other rides and devices for them to take the money from people who may go there and they have plenty of opportunity to bring it up from everybody who may go in there and enjoy the rides, *and they get your money by games of chance and games of skill, besides the rides.*" (Italics ours.)

It is urged that the italicized portion of this excerpt is objectionable since it might have affected the verdicts because of its content. The statement was immediately objected to, the remarks withdrawn, the objection sustained and the jury instructed to disregard said remarks. The first part of the quoted statement was apparently made in response to the remarks of defendant's counsel in his closing argument. As already stated, the remarks were immediately withdrawn and the jury advised to disregard them. There was no persistent misconduct on the part of plaintiffs' counsel and that complained of we consider harmless rather than prejudicial. In order for the alleged misconduct to justify reversal, it must appear from the

record that upon another trial a different result might be expected if the same error did not intervene, so that the alleged misconduct would deprive the defendant of some substantial legal right. (*Johnson v. Chicago City Railway Co.*, 174 Ill. App. 148.) It is inconceivable how a different result might be expected in this case in the event of another trial.

Defendant's final complaint is that the verdicts and judgments are excessive. Defendant merely urges a general objection to the amount of damages awarded without specifying any reasons therefor. After stating in its brief that "there is no criterion by which to judge the proper size of a verdict," it asks the question: "What should be the relation between damages for pecuniary loss and damages for pain and suffering?" This question does not admit of a definite answer since the damages awarded in any case must necessarily be determined by the facts and circumstances of the particular case. In passing upon a similar objection in *Metz v. Yellow Cab Co.*, 248 Ill. App. 609, the court said at p. 621:

"The amount of damages to be allowed is peculiarly a question for the jury and this court will not disturb a verdict unless it is clearly excessive or inadequate, indicating passion or prejudice on the part of the jury."

We have carefully read and considered all of the evidence in the record as to the nature and extent of plaintiffs' injuries and the money necessarily expended in being treated therefor, and such evidence furnishes ample justification for the amount of damages awarded plaintiffs.

For the reasons stated herein, the judgments of the circuit court are affirmed.

*Affirmed.*

FRIEND, P. J., and BURKE, J., concur.