Docket No. 110679.

IN THE
SUPREME COURT
OF
THE STATE OF ILLINOIS

PHOENIX INSURANCE COMPANY, Appellant, v. MARTHA
ROSEN, Appellee.

*Opinion filed April 21, 2011.*

JUSTICE GARMAN delivered the judgment of the court, with
opinion.
Justices Freeman, Thomas, Karmeier, Burke, and Theis concurred
in the judgment and opinion.
Chief Justice Kilbride took no part in the decision.

**OPINION**

This case presents the question of whether a provision allowing
either party to an insurance contract to demand a trial *de novo*
following arbitration is unenforceable when it appears in an
underinsured-motorist policy. For the reasons below, we hold that
such provisions are enforceable.

BACKGROUND

The facts are not in dispute. On April 19, 2001, Martha Rosen was
injured in an accident with another driver. The other driver's vehicle
was insured for a maximum limit of $25,000 for claims of bodily
injury, while Rosen's automobile insurance includes underinsured-
motorist coverage with a maximum limit of $500,000. Rosen filed a
claim with her insurer, Phoenix Insurance Company, requesting
coverage under the underinsured-motorist provisions of her policy.
The arbitration agreement contained in the underinsured-motorist
coverage provides:

"A. If we and an 'insured' do not agree:

1. Whether that person is legally entitled to recover damages under this endorsement; or

2. As to the amount of damages;

either party may make a written demand for arbitration. In this event, each party will select an arbitrator. The two arbitrators will select a third. If such arbitrators are not selected within 45 days, either party may request that the arbitration be submitted to the American Arbitration Association.

B. We will bear all the expenses of the arbitration except when the 'insured's' recovery exceeds the minimum limit specified in the Illinois Safety responsibility law. If this occurs, the 'insured' will be responsible up to the amount by which the 'insured's' recovery exceeds the statutory minimum for:

1. Payment of his or her expenses; and

2. An equal share of the third arbitrator's expenses.

C. Unless both parties agree otherwise, arbitration will take place in the county in which the 'insured' lives. Local rules of law as to procedure and evidence will apply. A decision agreed to by two of the arbitrators will be binding as to:

1. Whether the 'insured' is legally entitled to recover damages; and

2. The amount of damages. *This applies only if the amount does not exceed the minimum limit for bodily injury liability specified by the Illinois Safety Responsibility Law. If the amount exceeds that limit, either party may demand the right to a trial.* This demand must be made within 60 days of the arbitrators' decision. If the demand is not made, the amount of damages agreed to by the arbitrators will be binding." (Emphasis added.)

Following arbitration, Rosen was awarded $382,500, "subject to reduction by all applicable set-offs in favor of Travelers Insurance Company,[1] including but not limited to medical payments made by

---

[1] According to the pleadings, Phoenix Insurance Company is "a Travelers Insurance Company." Several documents in the record, including the

Travelers Insurance Company." Phoenix filed a complaint in the Cook County circuit court rejecting the arbitration award and demanding a jury trial, citing the so-called "trial *de novo*" provision of paragraph (C)(2) of the arbitration agreement, quoted above. Rosen filed an answer in which she asserted as an affirmative defense that the trial *de novo* provision was "invalid and unenforceable as against the public policy of the State of Illinois." She also filed a counterclaim asking the court to enforce the arbitration award in her favor.

Phoenix filed a section 2–615 motion to strike the affirmative defense and counterclaim for failure to state a claim. 735 ILCS 5/2–615 (West 2006). Phoenix relied on *Zappia v. St. Paul Fire & Marine Insurance Co.*, 364 Ill. App. 3d 883 (1st Dist. 2006), in which the appellate court upheld a trial *de novo* clause in a similar underinsured-motorist policy. After briefing, the court granted Phoenix's motion, striking Rosen's affirmative defense and dismissing her counterclaim with prejudice. The court's order included a finding that the dismissal of the counterclaim was final and there was no just reason to delay appeal or enforcement of that dismissal, pursuant to Supreme Court Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010)).

Rosen appealed, and the appellate court reversed. No. 1–08–2776 (unpublished order under Supreme Court Rule 23). The appellate court noted that prior decisions regarding the enforceability of trial *de novo* provisions in underinsured-motorist policies has "varied," citing two cases in which such provisions were struck down as violative of public policy: *Fireman's Fund Insurance Cos. v. Bugailiskis*, 278 Ill. App. 3d 19 (2d Dist. 1996), and *Parker v. American Family Insurance Co.*, 315 Ill. App. 3d 431 (3d Dist. 2000). The court also reviewed *Kost v. Farmers Automobile Insurance Ass'n*, 328 Ill. App. 3d 649 (5th Dist. 2002), in which the court allowed an *insured* to invoke the trial *de novo* clause, and *Zappia*, in which the court rejected *Bugailiskis* and found that the clause was enforceable.

After considering these cases, the court concluded that *Zappia* was "the exception to the rule" and declined to follow it. The court found that the trial *de novo* provision "unfairly and unequivocally favors the insurer over the insured because an insurance company is

---

arbitration decision and the "Automobile Policy Booklet," refer to Travelers rather than Phoenix. The distinction is not relevant to our decision.

unlikely to appeal a low binding arbitration award while very likely to appeal a high award." The court also found that such provisions violate "the public policy considerations in support of arbitration" by increasing the time and costs required to settle the dispute. The court therefore found that "trial *de novo* provisions in underinsured clauses are against public policy in Illinois." We granted Phoenix's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010). We subsequently granted the Illinois Trial Lawyers Association leave to submit an *amicus curiae* brief in support of Rosen. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

ANALYSIS

Whether a provision in a contract, insurance policy, or other agreement is invalid because it violates public policy is a question of law, which we review *de novo*. *In re Estate of Feinberg*, 235 Ill. 2d 256, 263 (2009). The circuit court's order granting a section 2–615 motion to dismiss is also reviewed *de novo*. *Wakulich v. Mraz*, 203 Ill. 2d 223, 228 (2003).

In deciding whether an agreement violates public policy, we must " 'determine whether the agreement is so capable of producing harm that its enforcement would be contrary to the public interest.' " *Feinberg*, 235 Ill. 2d at 265-66 (quoting *Kleinwort Benson North America, Inc. v. Quantum Financial Services, Inc.*, 181 Ill. 2d 214, 226 (1998)). This court has a long tradition of upholding the right of parties to freely contract. *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 64 (2006); *Vine Street Clinic v. HealthLink, Inc.*, 222 Ill. 2d 276 (2006). As we have stated, " 'it should be remembered that it is to the interests of the public that persons should not be unnecessarily restricted in their freedom to make their own contracts.' " *First National Bank of Springfield v. Malpractice Research, Inc.*, 179 Ill. 2d 353, 359 (1997) (quoting *Schumann-Heink v. Folsom*, 328 Ill. 321, 330 (1927)). Thus, the power to declare a private contract invalid on public policy grounds is exercised sparingly. *Progressive Universal Insurance Co. of Illinois v. Liberty Mutual Fire Insurance Co.*, 215 Ill. 2d 121, 129 (2005); *First National Bank of Springfield v. Malpractice Research, Inc.*, 179 Ill. 2d 353, 359 (1997). An agreement will not be invalidated unless it is clearly contrary to what the constitution, the statutes, or the decisions of the courts have

-4-

declared to be the public policy of Illinois or unless it is "manifestly injurious to the public welfare." *Progressive Universal*, 215 Ill. 2d at 129-30; *Mohanty*, 225 Ill. 2d at 65; *Schumann-Heink*, 328 Ill. at 330. Those seeking to have an agreement invalidated carry a "heavy burden" of demonstrating a violation of public policy. *Mohanty*, 225 Ill. 2d at 65; see also *Feinberg*, 235 Ill. 2d at 266 (" 'The courts apply a strict test in determining when an agreement violates public policy.' " (quoting *Kleinwort*, 181 Ill. 2d at 226)).

In relation to the judicial branch, the General Assembly, which speaks through the passage of legislation, occupies a "superior position" in determining public policy. *Reed v. Farmers Insurance Group*, 188 Ill. 2d 168, 175 (1999) (citing *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 29-32 (1996)). We have "strictly adhered to the position that the public policy of the state is not to be determined by the varying opinions of laymen, lawyers or judges as to the demands of the interests of the public." (Internal quotation marks omitted.) *Mohanty*, 225 Ill. 2d at 65 (quoting *Groome v. Freyn Engineering Co.*, 374 Ill. 113, 124 (1940), quoting *Zeigler v. Illinois Trust & Savings Bank*, 245 Ill. 180, 193 (1910)). Thus, " '[w]hen the legislature has declared, by law, the public policy of the State, the judicial department must remain silent, and if a modification or change in such policy is desired the law-making department must be applied to, and not the judiciary, whose function is to declare the law but not to make it.' " *Reed*, 188 Ill. 2d at 175 (quoting *Collins v. Metropolitan Life Insurance Co.*, 232 Ill. 37, 44 (1907)).

The trial *de novo* provision at issue in this case implicates several public policies. As noted above, we must first consider the relevant public policy expressed by the legislature in our statutes. For that, we turn to the Illinois Insurance Code (215 ILCS 5/1 *et seq.* (West 2006)) and the Illinois Safety and Financial Responsibility Law (625 ILCS 5/7–100 *et seq.* (West 2006)). Rosen and her *amici* argue that the trial *de novo* provision also violates our public policy favoring arbitration, so we review that policy as well.

Public Policy Supporting Underinsured-Motorist Insurance

With several exceptions not relevant here, all motor vehicles operated or registered in this state must be covered by a liability insurance policy. 625 ILCS 5/7–601(a) (West 2006). The policy must

include coverage for bodily injury in at least a minimum amount specified by the Financial Responsibility Law, currently $20,000. 625 ILCS 5/7–203 (West 2006). In addition, motor vehicle liability policies must include uninsured-motorist coverage. 215 ILCS 5/143a (West 2006). Uninsured-motorist coverage must be provided in an amount equal to the liability coverage, unless the insured specifically rejects such additional coverage. 215 ILCS 5/143a–2(1) (West 2006). If the uninsured-motorist coverage limit exceeds the minimum liability limit required by the Financial Responsibility Law, the policy must also include underinsured-motorist coverage in an amount equal to the uninsured-motorist coverage. 215 ILCS 5/143a–2(4) (West 2006).

The "principal purpose" of the mandatory liability insurance requirement is "to protect the public by securing payment of their damages." *Progressive Universal*, 215 Ill. 2d at 129. To further that end, uninsured-motorist coverage is required " 'to place the policyholder in substantially the same position he would occupy, so far as his being injured or killed is concerned, if the wrongful driver had had the minimum liability insurance required by the Financial Responsibility Act [citation].' " *Squire v. Economy Fire & Casualty Co.*, 69 Ill. 2d 167, 176 (1977) (quoting *Ullman v. Wolverine Insurance Co.*, 48 Ill. 2d 1, 4 (1970)). In *Sulser v. Country Mutual Insurance Co.*, 147 Ill. 2d 548, 555-58 (1992), this court examined the legislative history supporting the underinsured-motorist coverage provision and concluded that the legislative purpose of underinsured-motorist coverage is the same as that of uninsured-motorist coverage, "*i.e.*, to place the insured in the same position he would have occupied if the tortfeasor had carried adequate insurance." The court noted that "[u]ninsured and underinsured motorist policies provide virtually the same coverage to the insured," and that by providing for underinsured-motorist coverage in addition to uninsured-motorist coverage, "the legislature avoided the absurdity of a situation where a policyholder would receive fewer benefits in the fortuitous event of being injured by an underinsured rather than by an uninsured motorist." *Id.* at 557. Thus, as we have recently noted, under Illinois law liability, uninsured-motorist, and underinsured-motorist coverage provisions are "inextricably linked." *Schultz v. Illinois Farmers Insurance Co.*, 237 Ill. 2d 391, 404 (2010). All three serve the same underlying public policy: ensuring adequate compensation for

-6-

damages and injuries sustained in motor vehicle accidents.

Despite the interrelatedness of uninsured-motorist and underinsured-motorist coverages, relevant differences exist between the statutory mandates. The Illinois Insurance Code requires that "any dispute with respect to the coverage and the amount of damages" under an uninsured-motorist policy must be submitted for arbitration. 215 ILCS 5/143a(1) (West 2006). At the time of Rosen's injury, the statute also provided, "Any decision made by the arbitrators shall be binding for the amount of damages not exceeding the limits for bodily injury or death set forth in Section 7–203 of the Illinois Vehicle Code." 215 ILCS 5/143a(1) (West 2000). Thus, at the time of Rosen's injury, the arbitration provision in her underinsured-motorist policy matched the arbitration provision required by law for uninsured-motorist policies. In 2004, the statute was amended to create a higher binding threshold for awards where the policyholder has coverage exceeding the statutory minimum, up to a maximum threshold of $50,000 for a single injured person. It now provides: "Any decision made by the arbitrators shall be binding for the amount of damages not exceeding $50,000 for bodily injury to or death of any one person, $100,000 for bodily injury to or death of 2 or more persons in any one motor vehicle accident, or the corresponding policy limits for bodily injury or death, whichever is less." 215 ILCS 5/134a(1) (West 2008). However, the statutory provision mandating underinsured-motorist coverage has never required a similar arbitration agreement. Indeed, the underinsured-motorist statute has never required arbitration of any kind.


Public Policy Supporting Arbitration

As noted above, this case also implicates the Illinois public policy supporting arbitration as a means for resolving disputes. This court has noted that arbitration promotes the economical and efficient resolution of disputes. *Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr*, 124 Ill. 2d 435, 442 (1988); see also *Reed*, 188 Ill. 2d at 173. In general, the legislature has expressed its approval of arbitration through adoption of the Uniform Arbitration Act (710 ILCS 5/1 *et seq.* (West 2006)), which provides, *inter alia*, that an arbitration agreement "is valid, enforceable and irrevocable save upon such

grounds as exist for the revocation of any contract," with limited exceptions not relevant here. 710 ILCS 5/1 (West 2006). Thus, public policy in Illinois favors arbitration.

Unconscionability

In addition to the public policies supporting underinsured-motorist insurance and arbitration, Rosen argues that the trial *de novo* provision in her underinsured-motorist policy violates public policy because it is unconscionable. Rosen asserts that the provision unfairly favors the insurer over the insured, an assertion that our appellate court has also adopted in several cases. See *Fireman's Fund Insurance Cos. v. Bugailiskis*, 278 Ill. App. 3d 19, 23 (1996); *Parker v. American Family Insurance Co.*, 315 Ill. App. 3d 431, 434 (2000); *Samek v. Liberty Mutual Fire Insurance Co.*, 341 Ill. App. 3d 1045, 1050 (2003). Before we address the substance of that argument, some clarification of terms is useful. Although related, a finding that a contract provision is unenforceable because it is unconscionable is distinct from a finding that a contract provision is invalid because it violates public policy. Unconscionability takes two general forms; an agreement may be unenforceable if it is either procedurally or substantively unconscionable. *Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1, 22 (2006). Procedural unconscionability consists of " 'some impropriety during the process of forming the contract depriving a party of meaningful choice.' " *Id.* at 23 (quoting *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.*, 86 Ill. App. 3d 980, 989-90 (1980)). Factors to be considered in determining whether an agreement is procedurally unconscionable include whether each party had the opportunity to understand the terms of the contract, whether important terms were " 'hidden in a maze of fine print,' " and all of the circumstances surrounding the formation of the contract. *Id*. Substantive unconscionability concerns the actual terms of the contract and examines " 'the relative fairness of the obligations assumed,' " asking whether the terms are " 'so one-sided as to oppress or unfairly surprise an innocent party.' " *Id*. at 28 (quoting *Maxwell v. Fidelity Financial Services, Inc.*, 907 P.2d 51, 58 (1995)).

As discussed above, our public policy analysis asks whether the contract provision at issue threatens harm to the public as a whole, including by contravening the constitution, statutes, or judicial

decisions of Illinois. In contrast, an unconscionability analysis asks whether the agreement, by its formation or by its terms, is so unfair that the court cannot enforce it consistent with the interests of justice. In other words, the argument that a contract is invalid because it violates public policy "touch[es] upon matters of substance related to the public welfare rather than aspects of the bargaining process between the parties." Restatement (Second) of Contracts ch. 8, intro. note (1981).

Decisions of Illinois Courts

The courts of Illinois have also addressed the trial *de novo* provisions. In *Fireman's Fund Insurance Cos. v. Bugailiskis*, 278 Ill. App. 3d 19 (1996), our appellate court considered a trial *de novo* provision in an underinsured-motorist policy. In that case, the insured's underinsured-motorist policy contained a trial *de novo* provision substantially identical to the one in Rosen's policy. A panel of arbitrators awarded the insured $139,500.85, and the insurance company filed a claim demanding trial. Following the insured's motion for summary judgment, the trial court certified the question of whether the trial *de novo* clause was violative of public policy to the appellate court. *Id.* at 20-22.

The *Bugailiskis* court first noted that, although Illinois public policy favors arbitration, an arbitration provision does not violate public policy simply by requiring nonbinding arbitration. *Id.* at 21. The court then acknowledged that trial *de novo* provisions are common in insurance policies across the country, and that courts in several states have struck down the provisions as against public policy. See *id.* at 22 (collecting cases). Reviewing cases from other states, the court noted that trial *de novo* provisions, though "ostensibly neutral," in fact favor the insurer "unfairly and unequivocally." *Id.* The court further noted that an insurance contract "possesses some of the earmarks of an adhesive contract," and trial *de novo* provisions "frustrate the public policy goals of arbitration" by adding cost and delay when an award is rejected. *Id.* at 22, 23.

The *Bugailiskis* court acknowledged that some states have upheld trial *de novo* provisions against public policy challenges. *Id.* at 23. It also acknowledged the insurer's argument that several of the out-of-state cases that struck down the provisions did so in the

context of uninsured-motorist policies, not underinsured-motorist policies. *Id.* However, the court held,

> "we cannot think of any reason why the provision is less violative of public policy because it is applied to an *under*insured motorist claim instead of an *un*insured motorist claim.
>
> The contract allows [the insurer] to demand a jury trial if the arbitration award requires [the insurer] to pay any amount. This is because any award under the minimum liability amount would be covered by another policy in an *under*insured motorist claim. In an *un*insured motorist claim, the contract subjects [the insurer] to $20,000 (the minimum liability amount) of liability without the right to demand a jury trial. Therefore, the unequal application of the 'escape hatch' provision is actually less oppressive to the insured in an *un*insured motorist case." (Emphases in original.) *Id.* at 24.

The court in *Bugailiskis* therefore held that the trial *de novo* provision was unenforceable, and the arbitration award in favor of the insured was binding. *Id.*

Not long after *Bugailiskis* was decided, this court took up the public policy question in the context of uninsured-motorist policies. In *Reed v. Farmers Insurance Group*, 188 Ill. 2d 168 (1999), the insured plaintiff challenged the trial *de novo* provision in her uninsured-motorist policy, arguing that it was against public policy. This court acknowledged that courts of other states had invalidated the provisions as violative of the public policy supporting arbitration or because they are unfairly structured in favor of the insurer. However, we noted that none of those states have statutes authorizing the trial *de novo* provisions. *Reed*, 188 Ill. 2d at 174. This court also acknowledged the appellate court's decision in *Bugailiskis*, but it noted that *Bugailiskis* involved an underinsured-motorist policy, which is not required to contain the trial *de novo* provisions. *Id.* In contrast, the Illinois uninsured-motorist statute not only authorizes such provisions, it requires them. 215 ILCS 5/143a(1) (West 2006). As we noted in *Reed*, "this distinction is dispositive of this issue." *Reed*, 188 Ill. 2d at 174. As noted above, where, as in *Reed*, the legislature has spoken, the question of public policy is not for the courts to decide. Thus, *Reed* held that "the arbitration provision that

-10-

appears in the plaintiff's insurance contract is already an expression of public policy and represents the legislature's consideration of the question." *Id.*

The appellate court next considered trial *de novo* provisions in the underinsured-motorist context in *Parker v. American Family Insurance Co.*, 315 Ill. App. 3d 431 (2000). The *Parker* court acknowledged our holding in *Reed*, but found that it was expressly limited to uninsured-motorist policies. The court noted that *Reed* had distinguished *Bugailiskis* on the grounds that the uninsured-motorist statute does not require trial *de novo* provisions. *Id.* at 434-35. The court then found that, in contrast to the legislature's determination of public policy in the uninsured-motorist context, "the legislature has not given us any guidance concerning underinsured motorist coverage." *Id* at 435. Thus, the court relied on *Bugailiskis*, finding that the trial *de novo* provision was unenforceable and the parties' already-conducted arbitration was binding. *Id.* at 435-36.

In *Kost v. Farmers Automobile Insurance Ass'n*, 328 Ill. App. 3d 649 (2002), the appellate court considered an *insured's* attempt to enforce the trial *de novo* provision. The *Kost* court noted the holdings in *Bugailiskis* and *Parker* that trial *de novo* policies were void as against public policy, but it rejected the insurance company's attempt to invoke those decisions. *Id.* at 654. Although the court agreed that trial *de novo* provisions generally violated public policy, it found that allowing an *insured* to invoke the provision "does not frustrate public policy." *Id*. Indeed, the court noted, "it is of the highest irony that a provision that our courts have found to be against public policy because of manipulative drafting by insurers should now be claimed by defendant to be a shield against an insured's suit." *Id*. at 655.

The last case relied on by Rosen is *Samek v. Liberty Mutual Fire Insurance Co.*, 341 Ill. App. 3d 1045 (2003). There, the appellate court acknowledged that there may be situations where an insured wants to invoke the trial *de novo*, as had occurred in *Kost*. However, the *Samek* court held that "trial *de novo* provisions disturbingly take on the character of adhesion contracts because they lack a mutuality of remedy between the insurer and the insured." *Id*. at 1051. Thus, the *Samek* court followed *Bugailiskis* and *Parker*, declaring the trial *de novo* provision unenforceable as against public policy. *Id.*

Most recently, however, the appellate court in *Zappia v. St. Paul*

*Fire & Marine Insurance Co.*, 364 Ill. App. 3d 883 (2006), held that trial *de novo* provisions do not violate public policy. *Id*. at 887-88. That case, like *Kost*, involved an attempt by an *insured* to invoke the provision. The *Zappia* court reviewed *Bugailiskis*, *Parker*, and *Samek*, but noted that *Kost* and *Zappia* both countered the assertion that only an insurance company would want to enforce the trial *de novo* provisions. *Id*. at 887. The *Zappia* court also quoted the dissenting justice in *Samek*, who wrote:

> "I find it somewhat anomalous for the judiciary of this state to find a contractual provision relating to the arbitration of underinsured-motorist claims to be contrary to public policy when, at the same time, an almost identical provision relating to the arbitration of uninsured-motorist claims is mandated by the legislature. As the supreme court has acknowledged, the legislature occupies a superior position in determining public policy (*Reed*, 188 Ill. 2d at 175), and I can conceive of no difference in the public and private interest factors which are relevant to a determination as to the propriety of permitting trial *de novo* clauses to be included in arbitration provisions governing uninsured-motorist coverage as compared to those governing underinsured-motorist coverage." *Samek*, 341 Ill. App. 3d at 1053 (Hoffman, J., dissenting).

The *Zappia* court noted, as had the courts in *Bugailiskis*, *Parker*, and *Samek*, that Illinois public policy favors arbitration of all sorts and does not require that arbitration be binding. *Zappia*, 364 Ill. App. 3d at 887. Thus, the court held that trial *de novo* provisions do not violate public policy, disagreeing with majority opinions in *Bugailiskis*, *Parker*, and *Samek*. *Id.* at 888.

Application to the Present Case

As we have noted, the power to declare a private contract invalid on public policy grounds is exercised sparingly. *Progressive Universal Insurance Co. of Illinois v. Liberty Mutual Fire Insurance Co.*, 215 Ill. 2d 121, 129 (2005); *First National Bank of Springfield v. Malpractice Research, Inc.*, 179 Ill. 2d 353, 359 (1997). Because it is primarily the function of the legislature, not the courts, to construct public policy, " '[w]hen the legislature has declared, by law, the public policy of the State, the judicial department must remain silent, and if

-12-

a modification or change in such policy is desired the law-making department must be applied to, and not the judiciary, whose function is to declare law but not to make it.' " *Reed*, 188 Ill. 2d at 175 (quoting *Collins v. Metropolitan Life Insurance Co.*, 232 Ill. 37, 44 (1907)).

Rosen urges us to find, as the appellate court did in *Parker*, that the legislature has not spoken to the public policy of trial *de novo* provisions in underinsured-motorist policies. However, such a finding would require us to overlook the clear statement of public policy found in the uninsured-motorist statute, a statute we have held is "inextricably linked" with the underinsured-motorist statute at issue. *Schultz*, 237 Ill. 2d at 404. As we acknowledged in *Reed*, the legislature has determined that trial *de novo* provisions are consistent with the public policy of this state when they appear in uninsured-motorist policies. Importantly, the legislature did more than simply condone the use of such provisions in the uninsured-motorist context; it explicitly *required* their use. 215 ILCS 5/143a(1) (West 2006). Correspondingly, the public policy of Illinois does not merely condone the use of trial *de novo* provisions in uninsured-motorist policies. It is the public policy of Illinois that such provisions must be included.

As we have repeatedly emphasized, the legislative considerations behind the underinsured-motorist statute are the same as those underlying the uninsured-motorist statute. Both statutes ensure that an injured policyholder will be compensated for her damages up to the limits of coverage she has paid for, regardless of the coverage carried by the at-fault driver. *Sulser*, 147 Ill. 2d at 555-58; *Schultz*, 237 Ill. 2d at 404. This common purpose is underscored by the underinsured-motorist statute's requirement that coverage limits under that provision must equal the insured's uninsured-motorist coverage limit. 215 ILCS 5/143a–2(4) (West 2006). We acknowledge, of course, that the legislature has declined to enact a trial *de novo* requirement in the underinsured-motorist context. Thus, Rosen is correct that the legislature has not clearly defined Illinois' public policy with respect to trial *de novo* provisions in underinsured-motorist policies. However, the legislature's requirement of the provisions in uninsured-motorist policies is certainly evidence of the legislature's view of trial *de novo* agreements. Where the public policy as expressed by the legislature affirmatively requires a contractual provision in one

context, it would be inconsistent to say that an identical provision in a highly related context is so against public policy that we must refuse to enforce it, unless some distinction between the two contexts supports such a result.

Rosen first argues that trial *de novo* provisions violate our public policy supporting arbitration because they do not promote the final, efficient, and economical resolution of disputes. However, as noted above, Illinois public policy does not require that arbitration be binding. See, *e.g.*, *Mayflower Insurance Co. v. Mahan*, 180 Ill. App. 3d 213, 217 (1988). In addition to the decisions of our courts so holding, this fact is evident in the legislature's adoption of trial *de novo* provisions in the uninsured-motorist context. In fact, trial *de novo* provisions like those at issue here actually do more to promote the purposes of arbitration than "pure" nonbinding arbitration, because they ensure that at least some policyholders–those with low-value damages as determined by a neutral panel of arbitrators–receive an efficient and economical final resolution.

As we have stated, Illinois public policy favors arbitration. In the context of uninsured-motorist insurance, of course, this public policy applies with even more force because the statute requires that disputes "with respect to the coverage and the amount of damages" be submitted for arbitration. 215 ILCS 5/143a(1) (West 2006). In the uninsured-motorist statute, the legislature has required arbitration of claims since 1978, two years before the underinsured-motorist statute was even enacted. See Pub. Act 80–1135 (eff. July 1, 1978) (amending Ill. Rev. Stat. 1977 ch. 73, par. 755a ("Uninsured or hit and run motor vehicle coverage")); Pub. Act 81–1426, §1 (eff. Sept. 3, 1980) (adding Ill. Rev. Stat. 1981, ch. 73, par. 755a–2 ("Additional uninsured motorist coverage–Underinsured motorist coverage")). Thirteen years later the legislature amended the uninsured-motorist statute again, this time to require the trial *de novo* provisions. Pub. Act 86–1155 (eff. July 1, 1991) (amending 215 ILCS 5/143a(1)). Thus, even where the statute already supported the use of arbitration to resolve disputes in uninsured-motorist claims, the legislature acted to make arbitration nonbinding in some cases. In contrast, as noted above, the underinsured-motorist statute has never required arbitration. Rosen has suggested no reason that the conflict she points to between the goals of arbitration and trial *de novo* provisions should

render the provisions unenforceable in underinsured-motorist policies, where no type of arbitration is required, but not in uninsured-motorist policies, where arbitration is mandated.

Rosen also argues that the uninsured-motorist and underinsured-motorist statutes should be given different construction, and that we should not presume that the legislature's consideration of trial *de novo* provisions would carry over from uninsured-motorist to underinsured-motorist policies. First, she argues that the purposes of the two statutes differ. According to Rosen, the purpose of the uninsured-motorist statute "is to insure that compensation for persons injured by an uninsured motorist will be no less than the amount available for persons injured by a driver insured for the minimum amount ($20,000) required by section 7–203 of the Illinois Safety Responsibility Law." In contrast, she maintains that the purpose of underinsured-motorist coverage "is to provide compensation *above the minimum statutory amount* and up to the limits of the insured's liability limits." (Emphasis in original.)

As discussed above, the fundamental purpose of requiring insurance is "to protect the public by securing payment of their damages." *Progressive Universal*, 215 Ill. 2d at 129. All statutorily required insurance–liability, uninsured motorist, and underinsured motorist–seeks to fulfill this basic purpose. While mandatory liability insurance attempts ensure that all drivers carry at least $20,000 of bodily injury coverage, mandatory uninsured-motorist coverage protects a driver who has complied with the liability coverage requirement when she is injured by a driver who has not. As we have said, uninsured-motorist coverage therefore " 'place[s] the policyholder in substantially the same position he would occupy, so far as his being injured or killed is concerned, if the wrongful driver had had the minimum liability insurance required by the Financial Responsibility Act [citation].' " *Squire*, 69 Ill. 2d at 176 (quoting *Ullman*, 48 Ill. 2d at 4). If the claimant sustains damages less than the statutory minimum amount, both laws ensure that he will be made whole. If his damages exceed the statutory minimum, both laws ensure that he will be compensated for his damages at least up to the statutory minimum. If the tortfeasor is uninsured, the claimant will be compensated up to the limits of his own uninsured-motorist policy, which he has bargained for and paid for with his own insurer. If the

tortfeasor is insured, but for an amount less than the claimant has bargained for and paid for with his own insurer, mandatory underinsured-motorist coverage in an amount equal to his uninsured-motorist coverage ensures that the claimant will still be compensated up to the limits of his own uninsured-motorist policy.

Contrary to Rosen's assertion, underinsured-motorist coverage thus serves the same goal as uninsured-motorist coverage, "*i.e.*, to place the insured in the same position he would have occupied if the tortfeasor had carried adequate insurance." *Sulser*, 147 Ill. 2d at 555-58. The purpose is not, as Rosen argues, to ensure compensation above the statutory minimum; it is to ensure compensation of the insured's damages to the extent bargained for under his insurance policy. Therefore, when a neutral panel of arbitrators determines that a claimant's damages are less than $20,000, that claimant will be fully compensated. Our appellate court has also pointed out, correctly, that if an insured's damages are less than $20,000, the insurance company does not have to pay out under the underinsured-motorist policy at all. See *Bugailiskis*, 278 Ill. App. 3d at 24. However, if an insured's damages are less than the statutory minimum, the insured has no right to compensation from the underinsured-motorist policy, because her damages will have been fully covered by the tortfeasor's liability insurance. While the insurance company may benefit from the arbitrator's decision, the fact that her insurance company does not have to pay out under her policy does not change the amount of compensation to which the insured is entitled.

All of this reinforces our determination that uninsured-motorist and underinsured-motorist policies serve the same legislative purpose. See also *Sulser*, 147 Ill. 2d at 555-58; *Schultz*, 237 Ill. 2d at 404. Rosen argues that we should nonetheless apply public policy differently to them, pointing to the decisions of our appellate court in *Bugailiskis* and the cases that have followed. We note, however, that *Bugailiskis*, on which *Parker*, *Kost*, and *Samek* rely, was decided before *Reed* held that public policy is not violated by trial *de novo* provisions in uninsured-motorist policies. The *Bugailiskis* court therefore did not need to consider the uninsured-motorist statute, and it did not do so. In the absence of a clear statement of public policy by the legislature, the court was left with a blank slate on which to determine the public policy of Illinois. As we have explained,

however, our slate is not blank. In light of *Reed*'s decision upholding trial *de novo* provisions in uninsured-motorist policies against a public policy challenge, any subsequent analysis of the provisions in underinsured-motorist policies must, in our view, consider the relationship between uninsured-motorist coverage and underinsured-motorist coverage. As we recognized in *Reed* itself, however, this relationship was not implicated in *Bugailiskis*. *Reed*, 188 Ill. 2d at 174.

Finally, Rosen argues that the legislature's decision *not* to make any reference to trial *de novo* provisions in the underinsured-motorist statute indicates an intent "not to link" the underinsured-motorist and uninsured-motorist statutes in this regard. She argues that where the uninsured-motorist statute endorses the trial *de novo* provisions explicitly, we should not read mere silence as also an endorsement of the provisions. We agree. However, we will similarly not read mere silence as a *prohibition* of the provisions. To do so would be to require the legislature to enumerate in every statute all actions private parties may take that would not violate public policy. Here, the legislature has done more than simply allow the trial *de novo* provisions in a highly related statute. The provisions *must* appear in uninsured-motorist policies; if an insurance policy *does not* contain a trial *de novo* provision in its uninsured-motorist coverage, it is contrary to the statute and unenforceable as against public policy. *Schultz*, 237 Ill. 2d at 400 ("[t]erms of an insurance policy that conflict with a statute are void and unenforceable"). To hold, as Rosen urges, that the same insurance policy also violates public policy if it *does* include the provision in its underinsured-motorist coverage would be anomalous, and Rosen has not provided any difference between the two statutes that would lead us to such a result.

We note also that no other state has adopted such a difference. Courts in several states have invalidated trial *de novo* provisions on public policy grounds. See, *e.g.*, *Mendes v. Automobile Insurance Co. of Hartford*, 563 A.2d 695 (Conn. 1989); *Worldwide Insurance Group v. Klopp*, 603 A.2d 788 (Del. 1992); *Schmidt v. Midwest Family Mutual Insurance Co.*, 426 N.W.2d 870 (Minn. 1988); *Schaefer v. Allstate Insurance Co.*, 590 N.E.2d 1242 (Ohio 1992); *Pepin v. American Universal Insurance Co.*, 540 A.2d 21 (R.I. 1988). However, as Phoenix urges and Rosen concedes, no state has

distinguished between the use of trial *de novo* provisions in uninsured-motorist policies and their use in underinsured-motorist policies. Moreover, none of the states in which the provisions have been invalidated have statutes requiring the provisions; to our knowledge, section 143a of Illinois' Insurance Code is the only such statute in the country. Even in the absence of such a statute, however, courts in several jurisdictions have upheld the provisions against public policy challenges. See, *e.g.*, *Liberty Mutual Fire Insurance Co. v. Mandile*, 963 P.2d 295 (Ariz. Ct. App. 1997); *Roe v. Amica Mutual Insurance Co.*, 533 So. 2d 279 (Fla. 1988); *Cohen v. Allstate Insurance Co.*, 555 A.2d 21 (N.J. Super. Ct. App. Div. 1989).

For all of the above reasons, we conclude that Rosen has not met her burden of establishing that the trial *de novo* provision is unenforceable as against public policy. We therefore turn to her related argument that the provisions are unenforceable because they are unconscionable. Citing the appellate court's decisions in *Bugailiskis*, *Parker*, *Kost*, and *Samek*, Rosen argues that the provision lacks mutuality and unequivocally favors the insurer over the insured. She argues that insurance contracts bear the earmarks of adhesive contracts, and the trial *de novo* policy is so one-sided and oppressive that no rational insured would voluntarily agree to such a provision. We disagree.

First, even if we accept Rosen's argument that her insurance agreement is a contract of adhesion, such a finding does not render the agreement unenforceable. As we have held, adhesive contracts "are a fact of modern life. Consumers routinely sign such agreements to obtain credit cards, rental cars, land and cellular telephone service, home furnishings and appliances, loans, and other products and services. It cannot reasonably be said that all such contracts are so procedurally unconscionable as to be unenforceable." *Kinkel*, 223 Ill. 2d at 26. In *Kinkel*, even when this court found that the contract at issue was a contract of adhesion, our finding that the contract represented a "degree of procedural unconscionability" was based not on that fact, but on the "additional fact" that key information was incorporated only by reference. *Id.* at 26-27. Moreover, the combined effect of these facts in *Kinkel* still created a degree of procedural unconscionability insufficient to render the contract unenforceable; we found only that it was a "factor to be considered" in conjunction with

-18-

the claim of substantive unconscionability. *Id*. In contrast, Rosen has made no other argument of procedural unconscionability. Thus, even if the insurance contract is a contract of adhesion, Rosen must still establish substantive unconscionability that is, when taken with the adhesive character of the contract, sufficient to meet her burden of showing that the contract is so unconscionable that should not be enforced.

Rosen's principal argument regarding unconscionability is, in fact, one of substantive unconscionability. She argues that "the main purpose and effect of [trial *de novo*] clauses is to make low awards binding, which almost always favors the insurance companies, while making high awards non-binding, which also will usually favor the company." Although she acknowledges that the clause may be invoked by an insured, she asserts that "this does not avoid the inherent bias of a scheme designed to minimize a company's exposure by sticking insureds with low awards and allowing the insurer to escape from high awards."

Initially, we note that the trial *de novo* provision is not, as Rosen argues, totally one-sided. As the *Zappia* court pointed out, the provision allows an insured who is awarded an amount over $20,000 to seek a new trial if he believes the award is insufficient to cover his damages. While it is certainly true that an insurer is more likely to want an award less than $20,000 to be binding, it is not clear that any award over $20,000 will be rejected by the insurer. *Zappia* and *Kost*, which both arose from claims by an insured under the provisions, indicate that an insured may indeed wish to enforce a trial *de novo* provision. While such anecdotal evidence is not sufficient by itself to defeat Rosen's argument that the provisions are oppressive, those cases show that the insurance contracts at issue possess more than the mere illusion of mutuality that Rosen ascribes to them.

We also note that "the issue of unconscionability should be examined with reference to all of the circumstances surrounding the transaction" (*Kinkel*, 223 Ill. 2d at 24), and the structure of the arbitration provision in Rosen's insurance policy taken as a whole helps ensure some measure of fairness between the parties. When a conflict arises between the insurer and the insured under the underinsured-motorist provision, as occurred in this case, both parties are entitled to choose an arbitrator, and those two arbitrators together

select the third arbitrator. Then the parties may present evidence regarding the insured's damages and the insurer's liability. After hearing this evidence, the arbitrators reach a decision as to the amount of damages, if any, to which the insured is entitled under her insurance contract. Thus, when an insured is bound to an award less than $20,000, it is not an award crafted by the insurance company for its own benefit. Rather, the arbitration agreement is designed to result in an award that is the product of the informed and reasoned judgments of an impartial panel of arbitrators.

Of course, the insurance company benefits from the trial *de novo* provision. Unquestionably, the provision provides an "escape hatch" from what Rosen calls the insurer's "worst case scenario"–an award that is substantially higher than the company believes the claim is worth. Rosen argues that it does not provide a similar "escape" for the insured's worst case scenario–an award that is substantially lower than the insured believes his claim is worth–and this is true when the actual low award is less than $20,000.[2] The provision also allows an insurer to prolong resolution of an expensive claim, thus increasing the pressure on the insured to settle.

We have said that substantive unconscionability is concerned with the " 'relative fairness of the obligations' " assumed under the agreement, and that indications of substantive unconscionability are " 'contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity.' " *Kinkel*, 223 Ill. 2d at 28 (quoting *Maxwell*, 907 P.2d at 58). Applying that definition to the case at bar, we acknowledge that there is an imbalance in the rights imposed under the trial *de novo* provision in Rosen's insurance agreement. However, we do not find the terms to be so "inordinately one-sided" in favor of the insurance company that we must refrain from enforcing them. Rosen has not suggested that the terms of her insurance agreement were hidden from her or unclear

---

[2]We note that the range of awards an insured considers to be unacceptably low may well encompass awards of more than $20,000. For example, if an insured believes her claim entitles her to $300,000 under her policy, and the arbitrator's award is $25,000, the insured may wish to reject the award.

to her. On the contrary, she fully complied with the arbitration requirements of the provision, which appear in the same paragraph as the trial *de novo* clause. She was thus not "unfairly surprise[d]" when Phoenix rejected the arbitration award and demanded trial *de novo*. Although the trial demand does allow Phoenix to put additional time pressure on Rosen to settle her claim, the knowledge of the arbitrator's determination of damages allows both parties to better evaluate their bargaining positions with respect to settlement.

On these facts, we cannot say that the insurance contract is " 'improvident, oppressive, or totally one-sided.' " *Kinkel*, 223 Ill. 2d 28 (quoting *Streams Sports Club, Ltd. v. Richmond*, 99 Ill. 2d 182, 191 (1983)). We therefore reject Rosen's argument that the contract's provisions are unconscionable and cannot be enforced.

## CONCLUSION

For the above reasons, we hold that the provision in Rosen's underinsured-motorist policy allowing either party to reject an award over the statutory minimum for liability coverage does not violate public policy and is not unconscionable. To the extent that *Bugailiskis*, *Parker*, *Kost*, and *Samek* hold otherwise they are overruled.

Based on our holding, the circuit court's grant of Phoenix's 2–615 motion to dismiss Rosen's counterclaim was appropriate. Therefore, the judgment of the appellate court is reversed, and the judgment of the circuit court is affirmed.

Appellate court judgment reversed;
circuit court judgment affirmed.

CHIEF JUSTICE KILBRIDE took no part in the consideration or decision of this case.

-21-