In the
# United States Court of Appeals
## For the Seventh Circuit

No. 13-3869

DEANNE BERREY,

*Plaintiff-Appellant,*

*v.*

TRAVELERS INDEMNITY COMPANY
OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:11-cv-03426 — **Sue E. Myerscough**, *Judge.*

ARGUED SEPTEMBER 26, 2014 — DECIDED OCTOBER 22, 2014

Before FLAUM, MANION, and KANNE, *Circuit Judges.*

FLAUM, *Circuit Judge.* Deanne Berrey was injured in an automobile accident at work. The at-fault driver, who did not work with Berrey, carried liability insurance, but the cost of Berrey's injuries exceeded the insurance policy's limit. Berrey received partial compensation under her employer's workers' compensation scheme but, because her employer was not legally responsible for the accident, state law granted

the workers' compensation carrier a lien on any recovery Berrey received from the at-fault driver. To satisfy that lien, the at-fault driver's liability insurer paid its full policy limit directly to the workers' compensation carrier.

Defendant Travelers Indemnity Company of America provided underinsured motorist coverage to Berrey's employer. The policy covered an employee injured by a third-party tortfeasor who did not carry adequate auto insurance to fully compensate the employee for her loss. Pursuant to this policy, Travelers paid Berrey the difference between her total calculated damages and the at-fault driver's policy limit. Berrey claims that Travelers improperly deducted the at-fault driver's insurance payment from the total it owed to Berrey because that payment was made directly to the workers' compensation carrier rather than to Berrey herself. She argues that the language of Travelers's underinsured motorist policy precludes such a deduction. Because we read the language of the policy to support Travelers's calculation and because Berrey's reading would undermine the purpose of underinsured motorist coverage, we disagree and affirm the district court's grant of summary judgment in favor of Travelers.

## I. Background

On March 26, 2009, Berrey, an employee of Curry Ice & Coal, Inc., was on duty when her vehicle collided with another driven by Sheri A. Campbell. Campbell, who was not employed by Curry Ice, was found at fault for the accident. An arbitral panel constituted pursuant to an agreement between Berrey and Curry Ice issued a binding opinion, which calculated Berrey's total damages at $310,000, inclusive of all medical expenses.

Berrey, an Illinois resident, initiated three independent proceedings to recover for her injuries: (1) a workers' compensation claim against Curry Ice; (2) a liability claim against Campbell; and (3) an underinsurance claim against Travelers, a Connecticut corporation which provided underinsured motorist ("UIM") coverage to Curry Ice for the vehicle that Berrey was driving at the time of the accident.

Berrey first received $103,224.02 in workers' compensation benefits.[1] Pursuant to § 5(b) of the Illinois Workers' Compensation Act, 820 Ill. Comp. Stat. 305, Curry Ice acquired a workers' compensation lien against any recovery that Berrey subsequently obtained from Campbell.[2] Campbell's liability insurance carried a policy limit of $100,000, which her insurer paid directly to Curry Ice to satisfy the workers' compensation lien.

---

[1] This figure includes $51,535.27 in medical bills; $26,106.25 in temporary total disability benefit payments; and $25,582.50 in permanent partial disability benefit payments.

[2] When an Illinois employee is injured by a third party while acting within the scope of her employment, she is entitled to workers' compensation from her employer but may also sue the third-party tortfeasor for damages. 820 Ill. Comp. Stat. 305/5(b). The Illinois Workers' Compensation Act grants the employer a lien on any recovery obtained from the tortfeasor, up to the total value of the workers' compensation benefits paid to the employee. *Id.*; *see also Ullman v. Wolverine Ins. Co.*, 269 N.E.2d 295, 298 (Ill. 1970) ("[A]n employee who has received compensation under the Act is required to reimburse the employer from any recovery the employee receives from a third party legally responsible for the employee's injuries."). The purpose of the legislative scheme is to "allow[] both the employer and the employee an opportunity to reach the true offender while preventing the employee from obtaining a double recovery." *J.L. Simmons Co. ex rel. Hartford Ins. Grp. v. Firestone Tire & Rubber Co.*, 483 N.E.2d 273, 276 (Ill. 1985).

The underinsured motorist policy issued to Curry Ice by Travelers (the "Policy") carried a limit of $1 million per accident. Travelers paid Berrey $210,000—the difference between her total calculated damages ($310,000) and the payment from Campbell's insurer toward the workers' compensation lien ($100,000).

Under the Policy, which covered all vehicles owned by Curry Ice, Travelers agreed to "pay all sums the 'insured [employee]' is legally entitled to recover as compensatory damages from the owner or driver of an 'underinsured motor vehicle.'" Any recovery is subject to the following limitations:

> D. Limit of Insurance … .
>
>> 2. Except in the event of a "settlement agreement," the Limit of Insurance for this coverage shall be reduced by all sums paid or payable:
>>
>>> a. By or for anyone who is legally responsible, including all sums paid under this Coverage Form's Liability Coverage.
>>>
>>> b. Under any workers' compensation, disability benefits or similar law … .
>>
>> 4. No one will be entitled to receive duplicate payments for the same elements of "loss" under this Coverage Form and any Liability Coverage Form.

Berrey claims that, according to these provisions, Travelers owes her an additional $100,000. She first argues that the language of Section D.2 permits only a reduction in the policy

*limit* (here, $1 million) equal to workers' compensation bene-fits paid, not a reduction in the *amount due* if the insured's claim falls below the policy limit. Berrey also contends that, under Section D.4, she never "receive[d]" the $100,000 payment from Campbell because it was paid directly to Curry Ice to satisfy the workers' compensation lien; therefore, she would receive no impermissible "duplicate payment[]" if Travelers were to pay her an additional $100,000.

The district court rejected these arguments and awarded summary judgment to Travelers, determining that the $210,000 UIM payment fulfilled Travelers's obligations under the Policy. The court also denied Berrey's subsequent motion to alter or amend the judgment, emphasizing that Berrey received the benefit of the $100,000 paid by Campbell's insurer toward the workers' compensation lien and that awarding Berrey an additional $100,000 would therefore constitute a prohibited double recovery. Berrey appeals.

## II. Discussion

We review a district court's award of summary judgment de novo. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). Because our jurisdiction is based on diversity of citizenship, the resolution of substantive issues is governed by the applicable state law. *Aeroground, Inc. v. Center-Point Props. Trust*, 738 F.3d 810, 813 (7th Cir. 2013). The parties agree that Illinois law applies.

The Illinois Supreme Court has noted that the underlying purpose of underinsured motorist coverage is to "place the insured in the same position he would have occupied if the tortfeasor had carried adequate insurance." *Phoenix Ins. Co. v. Rosen*, 949 N.E.2d 639, 646 (Ill. 2011) (citation and internal

quotation marks omitted). The legislative history of § 143a-2 of the Illinois Insurance Code, 215 Ill. Comp. Stat. 5, which establishes the parameters of UIM coverage, confirms that it serves to "fill the gap between the claim and the amount available from the underinsured." *Sulser v. Country Mut. Ins. Co.*, 591 N.E.2d 427, 430 (Ill. 1992) (quoting 81st Gen. Assemb., House Proceedings 44–45 (Ill. 1980)). UIM coverage is not intended to permit an injured employee to collect more than she would have been entitled to receive from the tort-feasor alone.

Here, if Campbell had carried liability insurance in the amount of $310,000 (Berrey's total damages) rather than $100,000, Campbell's policy would have fully compensated Berrey for her loss. Of that hypothetical $310,000 insurance payment, $103,224.02 would have been paid to Curry Ice to satisfy the workers' compensation lien and the remainder ($206,775.98) would have gone to Berrey. In reality, Berrey has $210,000 (the UIM payment from Travelers) in her possession, and the workers' compensation lien has been satisfied via the $100,000 payment from Campbell's insurer.[3] She is therefore already in a marginally better position than she would have occupied had Campbell carried adequate insurance. Awarding Berrey an additional $100,000 would leave her with $310,000 in pocket, plus the $103,224.02 she received in workers' compensation benefits, for a total of over

---

[3] Although the $100,000 payment from Campbell's liability insurer was slightly lower than the total value of workers' compensation benefits Berrey received ($103,224.02), the lien was nevertheless deemed fully satisfied. The workers' compensation lien operated only against payments Berrey recovered from Campbell and the outstanding balance ($3,224.02) exceeded Campbell's policy limit.

$413,000 in damages—an unmerited windfall that far exceeds the arbitral panel's damages calculation. To permit such a double recovery would flout the stated purpose behind Illinois's underinsured motorist coverage scheme.

The plain meaning of the Policy language also contradicts Berrey's position. Illinois law requires us to interpret an insurance policy as a whole, taking into consideration the type of insurance purchased, the overall purpose of the contract, and the nature of the risks involved. *Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72, 75 (Ill. 1997). The policy's language must be construed according to the general rules of contract interpretation: so long as the language is unambiguous, it will be enforced as written, but only to the extent that it does not contravene public policy. *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005). In the event of an ambiguity, the policy's terms should be construed strictly against the drafter (here, Travelers). *Am. States Ins. Co.*, 687 N.E.2d at 75. However, a policy will be considered ambiguous only where its language is subject to more than one reasonable interpretation—we "will not strain to find an ambiguity where none exists." *Hobbs*, 823 N.E.2d at 564. Considered in the context of the Policy as a whole, we conclude that the language of Section D.4 is susceptible to only one reasonable interpretation.

As an initial matter, Berrey correctly points out that Section D.2 refers specifically to policy *limits*—that is, the maximum amount of underinsurance available—not the payment due on a claim whose value is less than the applicable policy limit. Because here the $1 million policy limit is significantly higher than Berrey's total damages ($310,000), the

question of limit reductions is irrelevant and Section D.2 is inapplicable.[4]

Instead, Section D.4 is determinative. It specifies, "No one will be entitled to receive duplicate payments for the same elements of 'loss' under this Coverage Form and any Liability Coverage Form." Berrey contends that this provision is not implicated because she never "receive[d]" the $100,000 payment from Campbell's insurer. Because that amount was paid directly to Curry Ice to satisfy the workers' compensation lien, as opposed to being paid first from Campbell's insurer to Berrey and then from Berrey to Curry Ice, she claims that the requested $100,000 from Travelers would not constitute a duplicate payment.

However, the simple act of cutting out the middleman cannot alter the conclusion that Berrey "receive[d]" Campbell's payment within the meaning of Section D.4. Although the $100,000 was not paid directly to her, she obtained the full benefit of that payment in its satisfaction of the workers' compensation lien. Had Campbell made the $100,000 payment directly to Berrey, Berrey would have been obligated to apply that payment toward the workers' compensation lien herself. *See Sulser*, 591 N.E.2d at 428. Further, according to Illinois law, Campbell's insurer would have risked liability

---

[4] The district court found that although Section D.2 explicitly refers only to policy limits, when read together with Section D.4, it "clearly [is] meant to allow a setoff of any amounts recovered in workers' compensation benefits by the insured." *Berrey v. Travelers Indem. Co. of Am.*, 917 F Supp. 2d 873, 881 (C.D. Ill. 2013). While this may be a plausible reading of the Policy, we need not strain the text of Section D.2 to extend to claims like Berrey's, where policy *limits* are not at issue.

under the lien if it had not paid the $100,000 directly to Curry Ice. Under the Illinois Workers' Compensation Act, once an insurer receives notice of a workers' compensation lien, it may not enter into a settlement agreement with an injured employee without the consent of her employer. *See* 820 Ill. Comp. Stat. 305/5(b) ("No release or settlement of claim for damages by reason of [employee's injury by a third party] … shall be valid without the written consent of both employer and employee … ."); *see also Hartford Accident & Indem. Co. v. D.F. Bast, Inc.*, 372 N.E.2d 829, 833 (Ill. App. Ct. 1977).

Given the structure of the Illinois workers' compensation scheme, the fact that Campbell's insurer paid the $100,000 directly to Curry Ice—presumably as a matter of convenience—had no practical effect on the amount that Berrey walked away with at the end of the day. To hold, based on a mere technicality, that Berrey did not "receive" the $100,000 payment would be to unreasonably interpret Section D.4, and Illinois law permits us to consider only reasonable interpretations of insurance policy language. *See Hobbs*, 823 N.E.2d at 564.

Berrey relies almost exclusively on the Illinois Appellate Court opinion, *Roberts v. Northland Insurance Co.*, 685 N.E.2d 371 (Ill. App. Ct. 1997), *overruled on other grounds by* 705 N.E.2d 762 (Ill. 1998), to support her reading of the term "receive." In *Roberts*, the court calculated the amount by which UIM coverage providers could reduce their policy limits via a setoff of workers' compensation benefits paid. At first glance, the facts appear similar to those of the instant case: Roberts was injured on the job by an underinsured third-party tortfeasor and was partially compensated for his loss through a combination of workers' compensation benefits,

the tortfeasor's liability insurance, and underinsured motorist coverage. *Id.* at 372. The applicable policy provisions allowed the UIM coverage providers to reduce their policy limits by amounts received both from workers' compensation and from the tortfeasor. *Id*. Roberts's total estimated damages were in excess of $1 million. 705 N.E.2d at 763. He received $246,114.26 in workers' compensation benefits. 685 N.E.2d at 372. The tortfeasor's liability coverage, which was limited to $50,000, was applied directly to the workers' compensation lien. *Id.* at 374. At issue was whether the UIM providers could deduct $246,114.26 from their policy limits as a setoff for workers' compensation benefits paid or whether they were limited to a deduction of only $196,114.26—the difference between the workers' compensation benefits and the $50,000 payment from the tortfeasor.

In holding that a deduction of only $196,114.26 was appropriate, the court concluded that, because Roberts "did not actually recover the $50,000" from the tortfeasor but rather, that amount was applied directly to the workers' compensation lien, the trial court did not err in denying a setoff for the full $246,114.26.[5] *Id.*

---

[5] The *Roberts* court noted that after the tortfeasor's $50,000 payment was applied to the workers' compensation lien, the workers' compensation benefits were "reduced by the $50,000 received from [the tortfeasor], for a net benefit of $196,114.26." 685 N.E.2d at 372. This calculation of "net" benefits is questionable. The $50,000 payment may have reduced the amount of the *lien* that Roberts's employer obtained against the tortfeasor, but it did not alter the value of the benefits themselves. Whether we calculate the benefits Roberts received as $246,114.26 from workers' compensation or as $196,114.26 from workers' compensation plus $50,000 from the tortfeasor's liability insurer, the fact remains that Roberts received tangible benefits totaling $246,114.26, which perhaps the

Although on appeal, the Illinois Supreme Court did not directly address the question of whether Roberts *received* the $50,000 payment from the tortfeasor's insurance carrier, the court noted in its recounting of the factual history that the tortfeasor's liability insurer had "paid [Roberts] $50,000 pursuant to [the tortfeasor's] policy." 705 N.E.2d at 763. This phrasing casts doubt on the appellate court's conclusion that Roberts did not "recover" that payment. As the district court below correctly observed, "Nothing in the Illinois Supreme Court's opinion reflects the Illinois Appellate Court's 'finding' that [Roberts] never received $50,000 from the tortfeasor because it was applied to the workers' compensation lien." *Berrey v. Travelers Indem. Co. of Am.*, No. 11-3426, at 10–11 (C.D. Ill. Nov. 20, 2013).

Further, regardless of whether we must accept the appellate court's characterization of the tortfeasor's insurance payment, *Roberts* is not controlling here. *Roberts* dealt with reductions in policy *limits* rather than in amounts due. There, the court grappled with the limits of coverage under a UIM policy where the plaintiff's actual damages exceeded any potentially applicable policy limit. Roberts's actual damages totaled more than $1 million while the available UIM coverage was limited to $820,000, before any deductions

---

UIM insurers should have been permitted to offset. Contrary to the suggestion of the district court below, a deduction in that amount would not have constituted an impermissible double setoff.

The Illinois Supreme Court partially overruled *Roberts*, *see* 705 N.E.2d 762, but did not analyze the correctness of the appellate court's arrival at the $196,114.26 figure. However, irrespective of the accuracy of the Illinois Appellate Court's reasoning, *Roberts* presented a distinct set of facts and, as a result, does not govern here.

for workers' compensation benefits received or payments made by the tortfeasor. 685 N.E.2d at 372. Given a maximum limit less than the total amount of Roberts's damages, the *Roberts* court faced a situation where, no matter how strict its ruling on setoffs, Roberts would remain undercompensated for his loss. Whatever the reasoning of the *Roberts* court's denial of the $50,000 setoff, that denial simply ensured that less of Roberts's damages went unpaid—it did not create a scenario that placed Roberts in a better position than he would have occupied had the tortfeasor carried liability in-surance sufficient to compensate him for his loss. The court's refusal to allow the $50,000 UIM limit reduction did not permit Roberts a double recovery.

By contrast, Travelers's UIM insurance policy carries a limit of $1 million—an amount that far exceeds any actual damages Berrey incurred. To refuse to consider the $100,000 payment from Campbell's insurer as an amount that Berrey "receive[d]" would lead to an impermissible double recovery, leaving Berrey better off than she would have been had Campbell possessed sufficient insurance. The *Roberts* court faced no such contravention of the purpose underlying UIM coverage. As a result of this crucial distinction, *Roberts* does not bind us here.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of Travelers.