2025 IL App (1st) 231912

No. 1-23-1912

First Division
February 18, 2025

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| AMY TAYLOR, | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 2021 L 1139 |
| | ) | |
| BROOKLYN BOULDERS, LLC, and | ) | |
| CHICAGO CLIMBING GYM COMPANY, | ) | Honorable |
| LLC, d/b/a Brooklyn Boulders, LLC, | ) | Thomas M. Cushing, |
| | ) | Scott D. McKenna, |
| Defendants-Appellees. | ) | Judges, Presiding. |

JUSTICE COBBS delivered the judgment of the court, with opinion.
Justices Lavin and Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1    This appeal stems from plaintiff-appellant Amy Taylor's complaint alleging negligence against defendants-appellees Brooklyn Boulders, LLC (Brooklyn Boulders), and Chicago Climbing Gym Company, LLC (Chicago Climbing Gym), doing business as Brooklyn Boulders, LLC. On April 25, 2023, the circuit court of Cook County granted summary judgment on all claims in favor of Brooklyn Boulders, and on September 26, 2023, the circuit court denied Taylor's motion to reconsider. From those decisions, Taylor appeals, arguing that the circuit court erred in

granting summary judgment and denying the motion to reconsider because the exculpatory agreement was invalid and unenforceable, as it violates public policy pursuant to the Amusement Ride and Attraction Safety Act (Safety Act) (430 ILCS 85/2-1 *et seq.* (West 2020)) and because defendants operate a common carrier. For the reasons that follow, we affirm.

¶ 2                                        I. BACKGROUND

¶ 3      On September 14, 2016, Taylor filed a complaint against Brooklyn Boulders in case number 2016 L 9116. The complaint was amended a few months later to add Chicago Climbing Gym as a defendant. On February 5, 2020, Taylor's complaint was voluntarily dismissed without prejudice, and she timely instituted this action by refiling her complaint on February 1, 2021. The operative complaint alleged one count of negligence against each defendant based on an incident that occurred on February 13, 2016, at the Brooklyn Boulders facility located at 100 South Morgan Street, Chicago, Illinois.

¶ 4      On February 14, 2022, the parties filed a joint motion for entry of a case management order, and, on February 23, 2022, the circuit court entered an order setting the requisite deadlines and specifically adopting all discovery conducted in the previously filed action, which included depositions of Taylor; Chris Noth, a former general manager of Brooklyn Boulders Chicago; and Matthew Pewthers, a former employee of Brooklyn Boulders Chicago. The following facts regarding the incident are taken from the complaint, depositions, and other documents in the record.

¶ 5      Prior to February 13, 2016, Taylor had previously visited the facility about a dozen times, beginning in November 2015. At her first visit to the facility on November 4, 2015, Taylor electronically signed a "Liability and Waiver Release" provided by the Brooklyn Boulders facility. The liability waiver, in pertinent part, provided as follows:

"WARNING, THIS RELEASE IS LEGALLY BINDING. PLEASE READ CAREFULLY BEFORE SIGNING. BY SIGNING YOU GIVE UP YOUR RIGHT TO RECOVER ANY COMPENSATION FOR ANY PERSONAL INJURIES, DAMAGE TO YOUR PROPERTY, OR FOR YOUR DEATH ARISING OUT OF YOUR USE OF CHICAGO CLIMBING GYM COMPANY, LLC, BROOKLYN BOULDERS CHICAGO *** FACILITIES, ROCK CLIMBING WALLS, MOBILE WALLS, OR EQUIPMENT[.] *** I FREELY AND VOLUNTARILY ASSUME COMPLETE RESPONSIBILITY for these risks and for the injuries that may occur as a result of these risks EVEN IF injuries occur in a manner not foreseeable at the time I sign this Release. I realize that by voluntarily assuming the risks involved, I am SOLELY RESPONSIBLE for any loss or damage I sustain, including PERSONAL INJURIES to me, damage to my PROPERTY, or damage arising out of my DEATH. I agree to release and discharge [Brooklyn Boulders Chicago] from and against any and all damages, actions, claims and liabilities of any nature specifically including, but not limited to, those arising out of my DEATH, or any damage related to the NEGLIGENCE of the Released Parties to the extent permitted by law, whether known or unknown, anticipated or unanticipated, suspected or unsuspected, relating to or arising from any activity, occurrence, or event involving [Brooklyn Boulders Chicago.]"

The facility offers patrons two different climbing activities: top rope climbing and bouldering. Taylor was engaged in top rope climbing during her prior visits to the facility and on the date in question. Brooklyn Boulders describes top rope climbing as follows:

"Top rope climbing is a form of climbing where a climber's rope is attached to the climber's harness via a figure eight knot. The rope extends to the top of the climbing route

wall over a belay tube at an anchor, is double-looped through the anchor at the top, and then extends to the floor. The climbing ropes openly hang in front of the climbing routes, with the climber's end closer to the wall and the belayer's end (with belay devices already attached) farthest away. The belayer, the climber's partner, attaches the belay device to her own harness, which acts as a brake to suspend a climber who may fall or needs assistance being lowered to the ground. The belayer double-checks the climber's knots prior to the climb, and during the climb stays on the ground and takes up the slack in the rope."

¶ 6    Additionally, according to Chicago Climbing Gym, the facility "had a mechanized pulley auto-belay system to assist climbers as an alternative to a human belayer partner on the ground," but "there was no auto-belay station where Taylor was climbing on February 13, 2016." On her first visit to the facility, Taylor completed a training class for new climbers. In that class, Taylor was taught how to tie the rope to her harness, how to belay, and how to use the equipment, and she practiced climbing a wall.

¶ 7    On February 13, 2016, Taylor visited the facility with her friend, Tegan Pitt, who was her climbing partner that day. Prior to her fall, she had completed three "runs" (or climbs), and she used her own climbing shoes and harness that day. Taylor knew how to use an auto-belay and was aware of the availability of auto-belays but did not use one because she had Pitt as a climbing partner, who would assist in a controlled descent as Taylor's belayer. The wall Taylor chose to climb was approximately 30 feet high, and she had climbed it on prior occasions. In her deposition, Taylor admitted that she tied the rope to her harness on that occasion. As she was ascending the wall and was about 15 feet above the ground, Pitt and a staff member informed Taylor that her rope was no longer attached to her harness. Taylor also stated that she would not have been able to climb down the wall because "[t]he shape of the rock or the peg wouldn't have allowed for a

strong grip." Taylor held onto the wall for approximately 30 seconds but eventually fell before a staff member was able to reach her.

¶ 8 As a result of her fall, Taylor sustained several injuries, including broken bones in both of her feet and a fracture of her L1 vertebrae. She was also diagnosed with post-traumatic stress disorder, resulting in panic attacks, as a result of her fall.

¶ 9 After Taylor filed her complaint, both defendants subsequently filed answers, asserting, *inter alia*, the liability waiver as an affirmative defense.

¶ 10 On June 16, 2022, Brooklyn Boulders filed a motion for summary judgment pursuant to section 2-1005 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1005 (West 2020)). Therein, Brooklyn Boulders argued that Chicago Climbing Gym solely owned the Brooklyn Boulders Chicago facility at the time of Taylor's injuries and, thus, Brooklyn Boulders owed no duty to Taylor. In particular, Brooklyn Boulders asserted that employee training, emergency crash pads, and any faulty equipment were the sole responsibility of Chicago Climbing Gym. It also argued that, even were it an owner or operator of the facility, the liability waiver disclaims any duty owed to Taylor. On June 24, 2022, Chicago Climbing Gym filed its own motion for summary judgment, setting forth substantially the same arguments as Brooklyn Boulders with respect to the liability waiver.

¶ 11 On August 8, 2022, Taylor filed a response to defendants' motions for summary judgment, in which she argued that defendants are common carriers and operating an amusement ride and therefore the waiver is void and unenforceable as a matter of public policy. On August 25, 2022, Brooklyn Boulders filed a reply, followed by Chicago Climbing Gym's reply, filed on August 30, 2022.

¶ 12    On April 25, 2023, the circuit court entered an order, granting defendants' motions for summary judgment based on the liability waiver. Therein, the court specifically rejected Taylor's argument that defendants qualified as a common carrier. The court did not address Brooklyn Boulder's denial of liability based on claims that it did not own, possess, or operate the facility where the accident took place.[1]

¶ 13    On May 23, 2023, Taylor filed a motion to reconsider, arguing that section 2-14 of the Safety Act requires all licensed businesses to have "in force" a liability insurance policy covering bodily injury and that such requirement is rendered meaningless if defendants could simply have patrons sign a liability waiver. On June 21, 2023, both defendants responded to Taylor's motion, prompting her reply, filed on July 25, 2023.

¶ 14    On September 26, 2023, the court heard arguments on Taylor's motion for reconsideration and subsequently entered an order denying the motion.[2]

¶ 15    This appeal followed.

¶ 16                                    II. ANALYSIS

¶ 17    On appeal, Taylor argues that the circuit court erred in granting summary judgment and denying the motion to reconsider because the exculpatory agreement, or liability waiver, was invalid and unenforceable, as it violates Illinois public policy. She further requests that, if this court finds the liability waiver unenforceable, it also find that Taylor's claims of negligence survive summary judgment and the circuit court be reversed as to its grant of defendants' summary judgment motion and its denial of Taylor's motion to reconsider.

---

[1] Judge Scott D. McKenna ruled on the summary judgment motions.
[2] Judge Thomas M. Cushing ruled on the motion to reconsider as a successor judge.

¶ 18 Summary judgment is appropriate when " 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Suburban Real Estate Services, Inc. v. Carlson*, 2022 IL 126935, ¶ 15 (quoting 735 ILCS 5/2-1005(c) (West 2018)). "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). "Mere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). Our review of the court's decision granting summary judgment is *de novo*. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004).

¶ 19 A motion to reconsider seeks to bring to the court's attention "a change in the law, an error in the court's previous application of existing law, or newly discovered evidence that was not available at the time of the hearing." *People v. $280,020 United States Currency*, 372 Ill. App. 3d 785, 791 (2007). The decision to grant or deny a motion to reconsider is within the trial court's discretion, and we will not disturb the trial court's ruling absent an abuse of discretion. *Stringer v. Packaging Corp. of America*, 351 Ill. App. 3d 1135, 1140 (2004).

¶ 20 At issue here is the exculpatory agreement signed by Taylor. "An exculpatory agreement constitutes an express assumption of risk wherein one party consents to relieve another party of a particular obligation." *Platt v. Gateway International Motorsports Corp.*, 351 Ill. App. 3d 326, 330 (2004). The agreement "should contain clear, explicit, and unequivocal language referencing the types of activities, circumstances, or situations that it encompasses and for which the plaintiff agrees to relieve the defendant from a duty of care." *Garrison v. Combined Fitness Centre, Ltd.*, 201 Ill. App. 3d 581, 585 (1990). An exculpatory agreement will be enforced, absent fraud or

willful and wanton negligence, "unless: (1) there is a substantial disparity in the bargaining position of the two parties; (2) to uphold the exculpatory clause would be violative of public policy; or (3) there is something in the social relationship between the two parties that would militate against upholding the clause." *Id.* at 584. The rationale for supporting such contractual provisions is the "broad public policy permitting competent parties to contractually limit their respective liability and to allocate business risks in accordance with their business judgment." *Rosenstein v. Standard & Poor's Corp.*, 264 Ill. App. 3d 818, 826-27 (1993); see *Harris v. Walker*, 119 Ill. 2d 542, 548 (1988) (Illinois's public policy " 'strongly favors freedom to contract.' ") (quoting *McClure Engineering Associates, Inc. v. Reuben H. Donnelly Corp.*, 95 Ill. 2d 68, 72 (1983)).

¶ 21    In this case, there is no dispute that Taylor was a competent adult when she signed the waiver and that she read and understood the waiver. There is also no allegation that she was coerced into signing the waiver or that the waiver was misrepresented in any way to Taylor. Further, Taylor does not contest that her injuries fell within the scope of the liability waiver. Taylor's arguments solely rest on public policy considerations.

¶ 22    "An exculpatory agreement will not be enforced where it is found to contravene or thwart public policy considerations." *Evans v. Lima Lima Flight Team, Inc.*, 373 Ill. App. 3d 407, 415 (2007). The term "public policy" is generally used "to describe the customs, morals, and notions of justice that prevail in a state." *Zerjal v. Daech & Bauer Construction, Inc.*, 405 Ill. App. 3d 907, 911 (2010). A contract will be found to be against public policy " 'if it is injurious to the interests of the public, contravenes some established interest of society, violates some public statute, is against good morals, tends to interfere with the public welfare or safety, or is at war with the interests of society or is in conflict with the morals of the time.' " (Internal quotation marks

omitted.) *In re Estate of Feinberg*, 235 Ill. 2d 256, 265 (2009) (quoting *Vine Street Clinic v. HealthLink, Inc.*, 222 Ill. 2d 276, 296 (2006)).

¶ 23   However, "the power to declare a private contract invalid on public policy grounds is exercised sparingly." *Phoenix Insurance Co. v. Rosen*, 242 Ill. 2d 48, 55 (2011). This is so because of Illinois's strong public policy "that persons should not be unnecessarily restricted in their freedom to make their own contracts." *Schumann-Heink v. Folsom*, 328 Ill. 321, 330 (1927). The party seeking to invalidate a contract has a " 'heavy burden' of demonstrating a violation of public policy." *Phoenix Insurance Co.*, 242 Ill. 2d at 55 (quoting *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 65 (2006)).

¶ 24   Here, Taylor argues that the circuit court erred in granting summary judgment and denying her motion to reconsider because the liability waiver is unenforceable on two grounds. First, Taylor contends that the liability waiver violates the express language of section 2-14 of the Safety Act, which requires that defendants have in force a mandatory minimum of $1 million in liability insurance. Second, she contends that the liability waiver contravenes public policy governing common carriers.

¶ 25                              A. Violation of the Safety Act

¶ 26   We first address Taylor's argument that the liability waiver violates section 2-14 of the Safety Act and therefore is unenforceable. Specifically, she contends that the waiver impermissibly circumvents the requirement of the Safety Act for defendants to have "in force" a $1 million insurance policy.

¶ 27   The Safety Act, originally titled the Carnival and Amusement Ride Safety Act, became effective on January 1, 1985, and is a regulatory scheme to provide for the safe operation and inspection of amusement rides and attractions. Ill. Rev. Stat. 1985, ch. 111½, ¶ 4064; *Mitee Racers,*

*Inc. v. Carnival-Amusement Safety Board*, 152 Ill. App. 3d 812, 816 (1987); 430 ILCS 85/2-3, 2-6 (West 2022). The safety board created by the Safety Act has the power to enforce its rules, including the power to create the permitting and inspection process for amusement attractions, to suspend or revoke permits, to set insurance requirements, and to enforce penalties for noncompliance. 430 ILCS 85/2-8, 2-12, 2-10, 2-14, 2-15 (West 2022).

¶ 28    Specifically and as relevant here, section 2-14 states as follows:

"No person shall operate an amusement ride or attraction unless there is in force a liability insurance policy or policies in an amount of not less than $1,000,000 for bodily injury to or death of one or more persons ***. Any owner or operator applying for a permit or renewal must present proof of this insurance at the time of inspection[.]" *Id*. § 2-14.

For purposes of this appeal, defendants do not contest that they are subject to the Safety Act, and the parties do not dispute that the requisite liability insurance policy existed.

¶ 29    According to Taylor, defendants' "attempt to contract away from this mandatory statutory language is a violation of settled Illinois public policy," and "[t]he requirement under § 2-14 is a clear stance that the legislature would only allow the operation of amusement rides and attractions if an insurance policy of not less than $1 million protected the patrons in the event of injury." In response, both defendants argue that the Safety Act does not expressly prohibit exculpatory agreements or liability waivers. In particular, according to Chicago Climbing Gym, the Safety Act's "administrative requirement that operators maintain liability insurance should not infringe upon an individual's freedom to contract when [Chicago Climbing Gym's] compliance with safety regulations is not compromised by such agreements."

¶ 30    "As applied to contracts, the constitution, statutes, and decisions of the state courts are the proper sources of Illinois public policy ***." *Bruno v. Gabhauer*, 9 Ill. App. 3d 345, 347 (1972).

The General Assembly, speaking through its passed legislation, "occupies a 'superior position' in determining public policy." *Phoenix Insurance Co.*, 242 Ill. 2d at 55-56 (quoting *Reed v. Farmers Insurance Group*, 188 Ill. 2d 168, 175 (1999)). The best indicator of legislative intent is the statutory language itself, which should be given its plain and ordinary meaning. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 479 (1994). "Each word, clause or sentence of a statute must, if possible, be given some reasonable meaning," and "no word should be rendered superfluous or meaningless." *Kozak v. Retirement Board of the Firemen's Annuity & Benefit Fund of Chicago*, 95 Ill. 2d 211, 216 (1983). A reviewing court must not "search for any subtle or not readily apparent intention of the legislature" (*id.*), and "[s]tatutes must be construed to avoid absurd or unjust results" (*Evans v. Cook County State's Attorney*, 2021 IL 125513, ¶ 27). If the statutory language is ambiguous, the court may look beyond the language to consider the legislative purpose. *Reda v. Advocate Health Care*, 199 Ill. 2d 47, 55 (2002).

¶ 31    Here, section 2-14 requires that covered entities must maintain a certain monetary amount of liability insurance coverage in order to be approved for the applicable operating permit. This statutory provision does not include any reference to liability waivers or exculpatory clauses, nor does any section of the Safety Act govern such contractual provisions. There is nothing in the statutory language that would lead this court to conclude that the legislature intended to limit parties' freedom to contract. We only ascertain from the language that the legislature intended that, where an amusement ride operator is liable for a patron's injuries, there should be adequate insurance coverage. Pursuant to the validly executed liability waiver here, defendants were simply not liable. In the event that they were liable for Taylor's injuries, they did have the requisite insurance coverage. Accordingly, the circumstances before us do not plainly violate or contradict section 2-14.

¶ 32    Moreover, we reject Taylor's argument that the liability waiver renders the insurance policy not "in force" as required by section 2-14. Taylor defines the term "in force" as "valid," "operative," and "the state of existing and being enforced." In our view, defendants had an operative liability insurance policy that complied with section 2-14; however, whether that policy provided coverage or applied to these particular circumstances is a different matter altogether. Thus, the term "in force" and its definitions do not conflict with our conclusion that section 2-14 did not bar exculpatory clauses.

¶ 33    Turning to public policy found in the "decisions of the state courts," there is no decisional law interpreting this section of the Safety Act or any sections of the Safety Act that would have bearing in this case. There is also no case law from this jurisdiction addressing the validity of exculpatory clauses in the context of recreational rock-climbing facilities.

¶ 34    Taylor has, however, set forth the legislative history regarding the Safety Act, although we note that "[i]t takes more than the legislature's regulation of an industry *** for a public policy interest to be found." *Zerjal*, 405 Ill. App. 3d at 912. Notwithstanding the statute's unambiguous language, we review the legislative history on which Taylor relies to support her public policy argument.

¶ 35    First, Taylor points us to the General Assembly's proceedings in 1987, two years after the Safety Act's enactment, where the House of Representatives and the Senate both unanimously passed an amendment that would strengthen the requirement for liability insurance. In the House, Representative Frederick stated, "This is a needed Bill in order to be sure that we have amusement ride owners under the liability insurance requirement by the state" (85th Ill. Gen. Assem., House Proceedings, May 13, 1987, at 246-47 (statements of Representative Frederick)), and in the Senate, Senator Welch further explained that the amendment was intended to close a "loophole" by which

"a person [could] apply for a permit, have insurance or post a bond, but by the time they start operating the ride, they have not paid for the premium or have had it cancelled and received a refund" (85th Ill. Gen. Assem., Senate Proceedings, June 22, 1987, at 162-63 (statements of Senator Welch)).

¶ 36    Second, Taylor points us to the General Assembly's proceedings in 2013, where the proposed amendment sought to increase the minimum amount of liability insurance. The amendment ultimately passed with a constitutional majority. Senator Mulroe explained the amendment as follows:

"It would change the process to implement rules to address public safety concerns and to timely respond to issues affecting public health and—and safety concerns. Would also authorize the Department of Labor to suspend permits and attractions that are deemed unsafe. Would also create the [Carnival Safety Fund], which would be used to enforce the provisions of the [Safety] Act. It would also increase the liability limits from a hundred thousand to one million, which is actually the current minimum coverage that is written by insurers in practice today." 98th Ill. Gen. Assem., Senate Proceedings, Apr. 23, 2013, at 82-83 (statements of Senator Mulroe).

¶ 37    We find that neither the statements regarding the 1987 amendment nor the statement regarding the 2013 amendment supports Taylor's argument. Regarding the 1987 amendment, the concern of the legislature was that covered entities were cancelling their insurance policies once they received their permits, and to resolve that problem the legislature added the phrase "in force." If anything, this supports our conclusion that the legislature *did not* intend to use that phrase for the purpose of barring exculpatory clauses or requiring covered entities to employ their insurance

coverage in every case of injury. Rather, "in force" was intended to require an entity to maintain a valid insurance policy at all times. Here, defendants complied with that requirement.

¶ 38    As to the 2013 amendment, we cannot see how the increase in the amount of the insurance policy in any way relates to exculpatory clauses. In fact, the senator's statement seems to suggest that the amount was being raised simply to conform with the industry standard. No further legislative intent can be extrapolated from the legislative history of that particular amendment.

¶ 39    Had the General Assembly wished to bar exculpatory clauses, it would have done so, and case law has repeatedly shown the judiciary's deference to the General Assembly's decision whether to do so or not. Where the General Assembly has found it necessary to statutorily bar exculpatory agreements in certain industries, Illinois courts have repeatedly recognized that express intention and stated that, in those circumstances, exculpatory agreements are clearly violative of public policy. *First Financial Insurance Co. v. Purolator Security, Inc.*, 69 Ill. App. 3d 413, 417-18 (1979) (legislature has declared it against public policy for innkeepers, professional bailees, landlords, and building contractors to be immune from liability for negligence); *Rutter v. Arlington Park Jockey Club*, 510 F.2d 1065, 1068-69 (7th Cir. 1975) (recognizing that the legislature enacted statutes declaring void as against public policy exculpatory clauses in leases and in construction contracts). Correspondingly, where the General Assembly failed to include an express prohibition of exculpatory agreements in a statutory scheme, Illinois courts have held that the legislature revealed no clear public policy to bar such agreements and therefore the agreements were upheld. See *Cox v. US Fitness, LLC*, 2013 IL App (1st) 122442, ¶ 36 (in finding that an exculpatory clause in an agreement for a gym membership did not violate public policy, the court noted that "[n]o statute *** outright voids releases in gymnasium membership"); *Zerjal*, 405 Ill. App. 3d at 912 (recognizing that the statutory scheme addressed the licensing and regulation of

home inspectors but did not address inspectors' liability and, thus, the legislature showed no intention to prohibit or limit exculpatory clauses in home inspection contracts); *Harris*, 119 Ill. 2d at 549 ("[T]he legislature has dealt with liability for injuries caused by animals in the Animal Control Act, and they did not choose to preclude the use of exculpatory contracts."); *Kubisen v. Chicago Health Clubs*, 69 Ill. App. 3d 463, 467 (1979) (although the legislature made exculpatory agreements void in leases, the legislature did not expressly provide for such where athletic club contracts are concerned); *Owen v. Vic Tanny's Enterprises*, 48 Ill. App. 2d 344, 348 (1964) ("If the public interest is involved, it is for the legislature to make such pronouncements. Absent appropriate legislative action, we must hold that the instant exculpatory clause barred [the] plaintiff's suit ***.").

¶ 40 Significantly, the Safety Act has been amended several times since the issuance of the previously noted decisions, and the General Assembly has not chosen to include a provision to bar the use of liability waivers or exculpatory clauses for amusement rides or attractions. And, as stated above, none of the legislative history of the amendments to the Safety Act expressly reference exculpatory clauses or even allude to them. Thus, we will not construe the Safety Act "to add exceptions or limitations or change the law set forth in the statute." *Poullette v. Silverstein*, 328 Ill. App. 3d 791, 794 (2002).

¶ 41 Of the above-cited cases, we find *Harris* particularly instructive. There, the plaintiff was injured when he fell off a horse that he had rented from riding stables owned and operated by the defendant, and he asserted a claim of negligence against the defendant. *Harris*, 119 Ill. 2d at 545. The defendant moved for summary judgment, submitting an exculpatory agreement signed by the plaintiff. *Id.* The circuit court ruled that the agreement barred the plaintiff's lawsuit, and the appellate court reversed. *Id.* The supreme court reversed the appellate court and affirmed the

decision of the circuit court, finding that the exculpatory agreement was enforceable. *Id.* at 551. As relevant here, the court stated that it had not "uncover[ed] any policy reasons not to hold [the] release effective." *Id.* at 549. In particular, the court noted that the legislature actually dealt with the issue of liability for injuries caused by animals but "did not choose to preclude the use of exculpatory contracts." *Id.*

¶ 42     Similarly, here, the General Assembly chose to address the issue of liability insurance; however, despite barring exculpatory clauses in other statutory schemes, the General Assembly did not do so in the Safey Act. In fact, the same argument as Taylor asserts here could have been made in the *Harris* case, *e.g.*, that it would be an absurd result for the legislature to ensure that the owners of animals are held liable for injuries caused by their animals but then allow those same individuals to exculpate themselves through an exculpatory agreement or liability waiver. See *id.* at 546. However, the supreme court there came to the same conclusion as we do here, which is that the legislature addressed the issue of liability but declined to bar exculpatory clauses and thus an intent to do so could not be found in the statute. *Id.* at 549-50.

¶ 43     Additionally, we reject Taylor's reliance on *Dawkins v. Fitness International, LLC*, 2022 IL 127561. In that case, the plaintiff's wife suffered a cardiac event at the defendant's fitness center, and the employees at the fitness center failed to use an automatic external defibrillator (AED), which resulted in permanent and irreparable brain damage that rendered his wife disabled. *Id.* ¶¶ 1-3. The fitness center was covered by the Physical Fitness Facility Medical Emergency Preparedness Act (210 ILCS 74/1 *et seq.* (West 2012)), which required governed entities to have a functioning AED on site, a properly trained staff for the use of the AEDs, and a medical emergency plan. *Dawkins*, 2022 IL 127561, ¶ 7. The plaintiff argued that the statute also created a duty to actually *use* the AED when a medical emergency, like the one his wife suffered, arose.

*Id.* ¶¶ 8-10. The circuit court disagreed with the plaintiff, finding that the defendant complied with the statute and there was no duty to use the AED. *Id.* ¶ 15. The appellate court reversed, finding that the plain language of the statute provided for liability to attach where there has been willful and wanton use or nonuse of an AED. *Id.* ¶ 16.

¶ 44 The question before the supreme court was whether nonuse of the AED violated the statute and amounted to willful and wanton misconduct. *Id.* ¶ 26. The supreme court agreed with the appellate court, finding that the relevant statutes did not immunize the defendant "from liability arising from the failure to use an AED on an injured person, provided that such failure was willful and wanton." *Id.* ¶ 33. Notably, the court pointed out that both statutes expressly stated that there was no liability for use or nonuse of the AED "except for willful and wanton misconduct." (Internal quotation marks omitted.) *Id.* ¶ 32. Although the defendant also argued that nonuse of the AED did not constitute willful and wanton misconduct, the court made clear that whether the defendant's failure to use the AED constituted willful and wanton misconduct was a question for the trier of fact. *Id.* ¶¶ 36, 41.

¶ 45 We agree with defendants that *Dawkins* says nothing about the Safety Act, does not involve a negligence claim, and does not concern exculpatory agreements. In fact, Taylor admits that the cases are not factually similar. Rather, she considers the case instructive for the purpose of statutory interpretation because the supreme court there found that the statutory AED requirements evinced a legislative intent to provide an additional duty to actually use the AEDs when appropriate and it would render an absurd result if facilities were immune from the failure to use AEDs in the face of requirements to have staff properly trained in using them. Taylor then asserts that, similarly, it would be an absurd result to require entities covered under the Safety Act to obtain liability insurance if those same entities could then avoid liability through an exculpatory agreement.

Although we appreciate Taylor's point, the statutory interpretation in *Dawkins* cannot be wholly imported to the case before us. In *Dawkins*, not only did the other portions of the statutory scheme indicate the legislature's intent to create a statutory duty to use the AEDs when appropriate, but the statute also contained an *explicit* exception to immunity from liability where willful and wanton misconduct occurred, which is what the plaintiff alleged in his complaint. Taylor would have this court believe that the supreme court's decision was based solely on the AED compliance requirements, but that is not the case. The court's determination that there was a private right of action for willful and wanton misconduct regarding the nonuse of an AED was first based on the "plain and unambiguous meaning" of the statute, and the other statutory provisions provided support for this conclusion. See *id.* ¶¶ 33, 37.

¶ 46 In contrast, here, there is no express provision in the statutory scheme that would create a private right of action for negligence, that would prohibit the use of exculpatory clauses, or that would mandate that the insurance coverage be not only in force but also apply to all claims of negligence irrespective of a liability waiver. As we have stated, the plain and unambiguous meaning of the statute is that the legislature intended to require covered entities to have a certain amount of liability insurance, but we cannot read into that intention an additional meaning of barring exculpatory clauses where there is nothing further to support that reading. See *Kozak*, 95 Ill. 2d at 220 (statutes "should not be rewritten by a court to make them consistent with the court's idea of orderliness and public policy"). To do so would amount to conjecture and could be viewed as an impermissible "search for any subtle or not readily apparent intention of the legislature." *Id.* at 216. We find this conclusion is also in accordance with our supreme court's directive to exercise sparingly "the power to declare a private contract invalid on public policy grounds" (*Phoenix Insurance Co.*, 242 Ill. 2d at 55), especially as "it is not our role to make such policy" (*Feinberg*,

235 Ill. 2d at 265). See *Garrison*, 201 Ill. App. 3d at 584 (Illinois will not "interfere with the right of two parties to contract with one another if they freely and knowingly enter into the agreement.").

¶ 47    Finally, we reject Taylor's argument that the "public policy in the State of Illinois, pursuant to § 2-14, is that liability insurance must be available to an injured patron *only up to $1 million*" and "exculpatory agreements may be permissible beyond the $1 million in coverage." Although we understand Taylor's argument, we nevertheless find it without merit, as it would still require this court to find that the legislature intended to bar exculpatory clauses where the legislature did not express such an intent and no such intent can be found in the legislative history, case law, or anywhere else.

¶ 48    In sum, Taylor has failed to show that the liability waiver is clearly contradictory to section 2-14 of the Safety Act. See *Mohanty*, 225 Ill. 2d at 64-65 (stating that a private contractual provision is not contrary to public policy unless it clearly contradicts that which the constitution, statutes, or case law have declared to be public policy or it is manifestly injurious to the public's welfare). Accordingly, we conclude that the Safety Act does not bar the use of exculpatory clauses, and thus Taylor's argument on this point fails.

¶ 49                          B. Violation of Public Policy Regarding Common Carriers

¶ 50    Next, Taylor argues that the liability waiver involving a common carrier violates public policy and cannot be enforced. She contends that the belayer system used in top-rope climbing functions to transport patrons, and in particular, she argues that, although the climber is in control on the ascent of the wall, the belayer system controls the descent. And, according to Taylor, this is true whether utilizing the auto belayer or a partner belayer because she "relies entirely on the belay system to descend safely" and, "[i]f the belay system were not an indispensable part of the

transportation from high on the wall to the ground, [Taylor] could have at least attempted to control her own descen[t]."

¶ 51    In response, defendants assert that they are not common carriers and neither defendant is "in the business of transporting the public anywhere." Thus, according to defendants, "there is no special relationship" with Taylor that renders the liability waiver void.

¶ 52    An exculpatory agreement will be found unenforceable where there is a special relationship of a semipublic nature between the parties. *Zerjal*, 405 Ill. App. 3d at 912. Common carriers are considered to be in a special relationship with their patrons, as "Illinois law will not allow public carriers to contract away their liability to passengers." *Morrow v. Auto Championship Racing Ass'n*, 8 Ill. App. 3d 682, 685 (1972). The heightened status afforded to common carriers is "based on the protection of the public and to ensure that the carrier performs its essential and important duties." *Zerjal*, 405 Ill. App. 3d at 912. "Common carriers are charged with the highest duty of care when transporting passengers because passengers must wholly rely upon a common carrier's proper maintenance and safe operation of its equipment during passage." *Sheffer v. Springfield Airport Authority*, 261 Ill. App. 3d 151, 156 (1994); see *Zerjal*, 405 Ill. App. 3d at 912 ("[C]ommon carriers are responsible for their patrons' physical safety for which there is no second chance if a mistake should occur ***."). Thus, any contractual provision whereby a common carrier of passengers seeks to limit its liability as a result of negligence is void. *Checkley v. Illinois Central R.R. Co.*, 257 Ill. 491, 494 (1913); see Restatement (Second) of Torts § 496B cmt. *g* (1965) ("Having undertaken the duty to the public, which includes the obligation of reasonable care, [common carriers] are not free to rid themselves of their public obligation by contract, or by any other agreement.").

¶ 53    Thus far, Illinois courts have characterized the following, in addition to typical modes of transportation, as common carriers: owners of buildings with elevators (*Springer v. Ford*, 189 Ill. 430, 434 (1901)); a scenic railway at an amusement resort (*O'Callaghan v. Dellwood Park Co.*, 242 Ill. 336, 345 (1909)); a merry-go-round (*Arndt v. Riverview Park Co.*, 259 Ill. App.  210, 216-17 (1930)); a taxicab (*Metz v. Yellow Cab Co.*, 248 Ill. App. 609, 612 (1928)); and a Ferris wheel (*Pajak v. Mamsch*, 338 Ill. App. 337, 341 (1949)).

¶ 54    In contrast, our supreme court has rejected an escalator as a common carrier in *Tolman v. Wieboldt Stores, Inc.*, 38 Ill. 2d 519, 525 (1967). There, the court distinguished between escalators and elevators in the context of common carriers as follows:

> "The role of a passenger on a train, bus or elevator is a passive one, and ordinarily such a passenger cannot exercise any control over his own safety. However, a person on an escalator may actively participate in the transportation in a manner similar to the use of a stairway, and may contribute to his own safety. A passenger on an escalator, however, is unlike a person on a stairway in that he must deal with a moving mechanism over which he has no control." *Id.* at 524-25.

¶ 55    We find this distinction apt and applicable to the case before us. The facts in the record demonstrate that Taylor was not a "passive" passenger at the rock-climbing facility. She admitted that she provided her own shoes and harness, she tied the rope to her harness herself, and she declined to use an auto-belayer. As such, she actively participated in her transportation up and down the wall and contributed to her own safety, especially as she admitted that, if she had tied the rope correctly, she would not have fallen.

¶ 56    These same distinctions can be made between top-rope climbing and Ferris wheels, merry-go-rounds, and scenic railways. The latter modes of transportation do not require the active

participation of the passenger. Rather, the patron embarks upon the vehicle, and the vehicle transports the patron (sometimes to a new destination, sometimes back to the original destination) without any further assistance from the patron. Thus, we decline Taylor's request to expand the classification of common carriers to include recreational top-rope climbing where the participants maintain some control over their transport from point A to point B and their own safety during the transport.

¶ 57    Taylor's argument that defendants are transformed into common carriers upon a climber's descent also fails. Defendants assert that this argument was forfeited because it was not raised in the court below. A party forfeits issues it does not raise in the trial court; issues may not be raised for the first time on appeal. *Haudrich v. Howmedia, Inc.*, 169 Ill. 2d 525, 536 (1996). Taylor argues that the descent argument is merely a narrowing of the argument made in the circuit court, not a broadening or changing of the argument and, thus, it is not forfeited. We disagree. Although the circuit court considered whether the entire activity of top-rope climbing gave rise to the same duty generally owed to patrons by common carriers, the circuit court did not explicitly rule on whether only a climber's descent transforms a rock-climbing provider into a common carrier. The circuit court did not consider this compartmentalized form of Taylor's argument, and thus, it cannot be raised for the first time here.

¶ 58    Regardless, even if it were not forfeited, Taylor's argument is without merit. First, she was not descending at the time of her fall. Prior to her fall, the record reveals that Taylor had completed three "runs' that day. On what would be her fourth "run," she had only ascended about 15 feet up the 30-foot wall at the time of her fall, and there is nothing in the record to suggest that, before discovering that her rope was no longer attached, she had decided that she was done climbing at that point. Second, the descent in top-rope climbing is not exclusively in control of the operator

because the partner-belayer, *i.e.*, Pitt, would assist in the controlled descent. Finally, despite Taylor's statement that she was unable to climb down the wall because the pegs did not allow for a strong grip, climbers still have the option to do so without the assistance of the belayer.

¶ 59     Both defendants cite cases involving other recreational activities where courts have refused to find special social relationships that prohibit exculpatory agreements. In particular, in *Hamer v. City Segway Tours of Chicago, LLC*, 402 Ill. App. 3d 42, 43 (2010), the plaintiff sued the defendant for injuries she sustained while on a Segway tour run by the defendant. The plaintiff signed a release prior to participating in the tour. *Id.* On appeal from the circuit court's grant of summary judgment in favor of defendant, the plaintiff argued that she had a special relationship that rendered the release unenforceable. *Id.* at 44-45. Without analysis, this court rejected that argument, finding that the defendant was not a common carrier. *Id.* at 46. Top-rope climbing is similar to using a Segway in that some aspects of the vehicle or equipment are within the control of the "passenger." Thus, as in *Hamer*, we reject Taylor's argument that the liability waiver is unenforceable because a common carrier is involved.

¶ 60     As a final aside, we observe that the vast majority of amusement rides that would be covered by the Safety Act could likely qualify as common carriers, as they often transport passengers from one place to another (or back to the originating point) on vehicles that are not controlled by the passengers in any way (such as merry-go-rounds and Ferris wheels). Thus, in those many instances, section 2-14 would apply, and liability waivers could conceivably be rendered unenforceable. It is possible that the legislature did not foresee that certain facilities or activities would fall under the Safety Act but not be considered a common carrier. Nonetheless, it is for the legislature to determine whether amusement rides or facilities that are not common carriers should be barred from utilizing exculpatory agreements to avoid liability for injuries. See

*Reed*, 188 Ill. 2d at 175 (" '[I[f a modification or change in such policy is desired the law-making department must be applied to, and not the judiciary, whose function is to declare the law but not to make it.' " (quoting *Collins v. Metropolitan Life Insurance Co.*, 232 Ill. 37, 44 (1907))).

¶ 61    For the foregoing reasons, we must decline any departure from the strong public policy allowing parties to freely enter into contracts. Thus, we conclude that the liability waiver was enforceable and barred Taylor's negligence claims against defendants.[3] Accordingly, we hold that the circuit court properly granted summary judgment in favor of defendants and Taylor's motion to reconsider was properly denied.

¶ 62                                 III. CONCLUSION

¶ 63    For the reasons stated, we affirm the judgment of the circuit court.

¶ 64    Affirmed.

---

[3] Because we have concluded that the liability waiver is not against public policy, we need not address Taylor's additional argument, in the event that this court found the liability waiver unenforceable, that her claims should otherwise survive summary judgment.

*Taylor v. Brooklyn Boulders, LLC*, **2025 IL App (1st) 231912**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2021-L-1139; the Hon. Thomas M. Cushing and the Hon. Scott D. McKenna, Judges, presiding. |
| **Attorneys for Appellant:** | Francis Patrick Murphy and Mitchell W. Bild, of Corboy & Demetrio, P.C., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Bradford S. Purcell and Michael D. Sanders, of Freeman Mathis & Gary LLP, of Chicago, for appellee Brooklyn Boulders, LLC.<br><br>Julie A. Teuscher, Patrick M. Creagh, and Scott J. Brown, of Cassiday Schade LLP, of Chicago, for other appellee. |